IN THE SUPREME COURT OF TENNESSEE

AT KNOXVILLE

FILED

September 9, 1996

Cecil Crowson, Jr.
Appellate Court Clerk


FOR PUBLICATION

Filed:  September 9, 1996

| | | |
|---|---|---|
| C.L. RANDOLPH, | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | BRADLEY GENERAL SESSIONS |
| | ) | |
| | ) | |
| Vs. | ) | HON. M. DREW ROBINSON, |
| | ) | SPECIAL JUDGE |
| | ) | |
| VIRGINIA HENLEY RANDOLPH, | ) | |
| | ) | |
| Defendant/Appellant. | ) | No. 03-S-01-9510-CV-00119 |

**For Appellant:**

Roger E. Jenne
JENNE, SCOTT & BRYANT
Cleveland, Tennessee

**For Appellee:**

James F. Logan, Jr.
LOGAN, THOMPSON, MILLER,
 BILBO, THOMPSON & FISHER, P.C.
Cleveland, Tennessee

# O P I N I O N

REVERSED AND REMANDED;
TRIAL COURT JUDGMENT REINSTATED.                    ANDERSON, J.

We granted this appeal to clarify the statutory standard by which the validity of antenuptial agreements should be judged. The trial court in this case held the antenuptial agreement invalid, finding the wife did not "knowledgeably" sign the agreement, as required by statute[1]. The Court of Appeals, in a split decision, reversed, finding the totality of the circumstances established that the wife possessed sufficient knowledge of the husband's business affairs and financial status at the time she signed the agreement to meet the statutory requirement of "knowledgeably" executing the agreement and that the agreement was therefore enforceable.

We interpret the statutory requirement that an antenuptial agreement is enforceable only if entered into "knowledgeably" to mean that the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

Applying this standard, we have carefully reviewed the record in this case and conclude that the evidence does not preponderate against the trial court's finding that the wife did not "knowledgeably" sign the antenuptial agreement.

---

[1] "Notwithstanding any other provision of law to the contrary, . . . any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage which is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined in the discretion of the court to have been entered into by such spouses freely, knowledgeably and in good faith and without the exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms. " Tenn. Code Ann. § 36-3-501 (1991 Repl.).

Accordingly, the Court of Appeals' judgment is reversed and the judgment of the trial court is reinstated.

## BACKGROUND

In 1983, Virginia Perry Randolph contacted C.L. Randolph, a successful real estate businessman, about renting a place to live. They began dating, and in August of 1983, Virginia and her 13-year-old son moved into C.L.'s residence.

A little over one year later, in September, 1984, they were married. C.L. Randolph, age 52, had been previously married five times and Virginia Perry Randolph, age 46, had been married once before. On the day before their marriage, the parties entered into an antenuptial agreement prepared by C.L.'s lawyer. The agreement provided, in part, that in the event of divorce or death, each party released all marital rights in the separate property of the other.[2] Also, in the event of divorce, the agreement provided that the division of marital property was to be based upon the amount each party invested in the property.[3] At the time the agreement was executed, Virginia owned virtually no assets, except personal belongings, while C.L. had substantial real estate holdings that

---

[2] The agreement provides specifically that "Perry forever waives, releases, and relinquishes any and all claims to or rights or interest in, statutory, equitable or otherwise, to the separate property of Randolph owned by him prior to the marriage and to any property acquired after the date of the marriage which is acquired with the proceeds or income from property owned prior to the marriage or is traceable to property acquired prior to the marriage. This waiver and release includes but is not limited to any claims with respect to dower rights, widow's allowance, homestead, year's support, marital share, right to dissent from valid will, any statutory exempt property, or any other claim which she might acquire with respect to said property as the wife, widow, heir at law, next of kin, or distributee of Randolph."

[3] This provision in its entirety requires that "[i]n the event a division must be made of the parties' marital property, the marital property shall be divided based upon the amount invested by each of the parties. The parties may prove their investment based upon their records of income, purchases, and payments."

were valued in 1986, at approximately $800,000. In 1983, when the parties were living together, C.L. had a net worth of between $500,000 and $600,000.

Almost from the beginning of their marriage, the parties experienced difficulties, including mental and physical abuse, and adultery on the part of C.L.. In addition, the parties had substantial health problems, both before and during the marriage, which exacerbated the stress. Divorce actions were filed on at least two prior occasions during the ten-year marriage. The present action began when, in November of 1993, the parties again separated and C.L. filed for divorce, asking that the antenuptial agreement be enforced. Virginia counter-claimed, asserting that the agreement was the result of fraud, duress, coercion, undue influence, and misrepresentation.

At trial, Virginia testified that she had never seen the antenuptial agreement until the day she signed it, which was one day before the parties were married. Virginia admitted she reviewed the agreement on the drive to the attorney's office, but claimed that no one explained it to her. Because she was responsible for a minor child and suffering from breast cancer at the time the agreement was executed, Virginia said her only choices had been to sign the agreement or be kicked out of the residence she and her son had shared with C.L. for the previous year. As to her knowledge of property covered by the agreement, Virginia admitted that she knew about some of C.L.'s property holdings, but she insisted that she was not aware of, nor did anyone disclose to her, the full extent and value of his assets and holdings.

Virginia was not represented by counsel when she signed the agreement. However, George McCoin, C.L.'s attorney who drafted the antenuptial agreement, was present when it was executed and testified that it is his normal practice to explain such agreements to both parties to insure a mutual understanding of the terms. McCoin, however, could not specifically recall following that practice with Virginia. In addition, McCoin acknowledged that he did not provide Virginia with a copy of C.L.'s financial statement prior to execution of the agreement, nor discuss the specific dollar value of C.L's holdings with her, but instead only discussed C.L.'s assets in general terms.

Likewise, C.L. admitted that he never advised Virginia of his net worth, which in 1983 was between $500,000 and $600,000. He asserted, however, that she was aware of the nature of his holdings since they had lived together for more than one year before the agreement was signed, and she had accompanied him to many of his properties to collect rent. In addition, C.L. testified that Virginia had reviewed the agreement prior to signing it and had made suggestions for changes, including a provision relating to a watch. Although Virginia conceded she read that provision before signing the agreement, she denied that the provision was included on her suggestion.

Based on the foregoing proof, the trial court found that both parties had contributed to the breakup of the marriage and awarded the divorce to each. Although rejecting the defendant's claim that the agreement was procured by fraud, duress, coercion, undue influence, and misrepresentation, the trial court concluded that the antenuptial agreement was invalid. In so holding, the trial court stated as follows:

The concern of the Court goes to the "knowledgeably" requirement in the statute. The failure to prove this requirement in the Court's opinion would create an inceptual impediment to the contract. The defendant has the burden of proof in this regard. The particular contract in question indicates that "each party has sought and obtained independent counsel regarding this matter." This is simply not the case according to all the proof. Mr. McCoin represented Mr. Randolph in the transaction. He did not remember going over the agreement with each at the time of signature. He was not required under his duties to go over the agreement with Mrs. Randolph. Proof of independent counsel would have overcome the "knowledgeably" requirement. The Court is of the opinion that Mrs. Randolph probably did not have the means nor perhaps the wherewithal to secure independent counsel to advise her of the consequences of the arrangement she was about to enter into. It was incumbent upon Mr. Randolph to assist in this regard due to the prior relationship between the parties and the obvious bargaining disparity. Mr. Randolph was a learned businessman very shrewd in his dealings. Mrs. Randolph did not possess similar tools nor abilities. The agreement states an untrue fact on the issue of independent counsel. This is a fatal flaw to the Court under the facts set out above. For this reason the Court finds that the antenuptial agreement is void and therefore sets it aside.

Upon finding the agreement void and unenforceable, the trial court awarded Virginia the following:

(a)     $3,705, representing her one-half interest in the household property purchased after the marriage;

(b)     $41,500, representing her interest in the other marital property;

(c)     $125,000, as alimony in-solido; and

(d)     $3,000, in attorneys fees.

C.L. appealed, and in a split decision, the Court of Appeals concluded that the evidence preponderated against the trial court's decision as to Virginia's knowledge when she signed the agreement. The Court of Appeals determined that neither independent counsel nor a financial statement is absolutely

necessary to satisfy the "knowledgeably" requirement of the statute. Accordingly, the Court of Appeals reversed the judgment of the trial court with respect to the validity of the antenuptial agreement, the division of marital property, and the award of alimony.

Thereafter, we granted permission to appeal to consider the knowledge required to sustain the validity of an antenuptial agreement. We review the findings of fact by the trial court de novo upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, we give great weight to the trial judge's findings on issues involving credibility of witnesses. Gillock v. Board of Professional Responsibility, 656 S.W.2d 365, 367 (Tenn. 1983).

## KNOWLEDGE

It is now well settled in Tennessee that public policy allows the enforcement of antenuptial agreements if certain prerequisites are satisfied. For example, Tenn. Code Ann. § 36-3-501(1991 Repl.) provides that "if such agreement is determined in the discretion of the court to have been entered into by such spouses freely, knowledgeably and in good faith and without the exertion of duress or undue influence upon either spouse," it is enforceable.

Thus, under the statute, such agreements are enforceable if entered into freely, knowledgeably, and in good faith, without the exertion of duress or undue influence. Since both the trial court and the Court of Appeals rejected the wife's

claim that the agreement was procured by fraud, duress, coercion, undue influence, and misrepresentation, the only issue in this appeal is whether the agreement was entered into "knowledgeably."

The wife contends that the agreement was not entered into knowledgeably since the husband did not make a full and fair disclosure of the nature, extent, and value of his assets, and she had no independent knowledge of that information. On the other hand, the husband argues that disclosure was not necessary in this case, since the wife had gained knowledge of his holdings as a result of their relationship prior to marriage.

These contentions arise from interpretations of prior Tennessee decisions rendered both before and after enactment of the above statute. Prior to the statute, at common law, the rule governing the disclosure required to validate antenuptial agreements was announced by the Court of Appeals in Baker v. Baker, 24 Tenn. App. 220, 142 S.W.2d 737 (1940). In that case, Mrs. Baker brought suit to set aside an antenuptial contract by which she had waived her statutory right to share in the estate of her deceased husband. She claimed that when the agreement was signed, she did not know her husband was a wealthy man. She asserted that her husband had a duty to disclose that information since the parties were engaged and therefore in a confidential relationship when the agreement was executed.

The Baker court agreed and stated the rule as follows:

> The rule supported by the weight of authority may be stated thus:
> An engagement to marry creates a confidential relation between
> the contracting parties and an antenuptial contract entered into

after the engagement and during its pendency must be attended by the utmost good faith; if the provision for the prospective wife is, in the light of surrounding circumstances, wholly disproportionate to the means of her future husband and to what she would receive under the law, the burden rests on those claiming the validity of the contract to show that there was a full disclosure of the nature, extent and value of the intended husband's property, or that she had full knowledge thereof without such disclosure, and that she, with this knowledge, voluntarily entered into the antenuptial settlement.

It should be noted that under this rule the contract is not invalidated merely because the portion fixed for the bride is small or disproportionate, for, if fully informed and advised, the intended wife may be entirely satisfied with the provision made for her, and, if she then voluntarily enters into the contract she is bound by its terms.

Id. at 745-46 (citations omitted).

This Court first addressed the disclosure issue following adoption of Tenn. Code Ann. § 36-3-501(1991 Repl.) in Kahn v. Kahn, 756 S.W.2d 685 (Tenn. 1988). In that case, the parties met at a restaurant, where the prospective wife worked as a waitress and the prospective husband was a patron. The husband was a relatively wealthy businessman, while the wife owned virtually no assets. The prenuptial agreement was the suggestion of the husband and was prepared by the husband's lawyer. The agreement involved the release of all marital rights in the separate property of each spouse, but required the husband to provide the wife, in the event of divorce, a two-bedroom house or condominium for as long as she resided therein or until she remarried. Id., at 686. As in the present case, the agreement in Kahn was signed one day before the parties were married, and the wife did not have the assistance of independent counsel. However, there, as here, the parties had lived together for more than one year prior to their marriage.

-9-

Mrs. Kahn testified that she was not made fully aware of the extent of Mr. Kahn's financial dealings before executing the agreement, but she conceded that she knew approximately a year and a half before signing the agreement that he was worth "millions of dollars" and "was making around $360,000 a year from all his investments." Id. at 690. In addition, Mr. Kahn testified that he informed her prior to signing the prenuptial agreement that his net worth was between eight and nine million dollars. Id.

In determining the validity of the agreement, this Court discussed the rule announced by Baker, and compared it to the requirements of the statute, stating as follows:

> A comparison of the requirements of the statute and the *Baker* rule reveals that the statute makes no reference to the requirement in *Baker* that where the provision for wife in an antenuptial agreement is wholly disproportionate to the husband's wealth, a full disclosure of the nature, extent and value of husband's property is required to sustain the validity of the agreement. Of course, numerous factual scenarios could occur in which the failure to make a full disclosure of assets, liabilities and values would breach the statutory requirement that the contract was entered into freely, knowledgeably and in good faith. **However, in this case it is not necessary that we resolve the apparent conflict between the *Baker* rule and the statute because we find that the antenuptial agreement between these parties fully complies with the tests imposed in either of those rules.**

Id. at 694 (emphasis added).

Applying the rules announced in Baker, the Kahn court specifically held "the antenuptial agreement valid because the wife had full knowledge of the nature, extent and value of the intended husband's property at the time she executed the agreement, making full disclosure at that time unnecessary." Id. at 696. The record in Kahn reflected that Mrs. Kahn was aware of every valuable

asset Mr. Kahn owned at the time she signed the agreement, and Mr. Kahn did not underestimate the value of any asset.

Initially, this case requires that we resolve the issue left open in <u>Kahn</u> -- whether the statute abrogated the rule announced in <u>Baker</u> requiring proof of full disclosure or independent knowledge to validate an antenuptial agreement. It is instructive to note that the rule announced in <u>Baker</u> remains the prevailing view throughout the country. <u>See</u> <u>generally</u> Judith T. Younger, <u>Perspectives on Antenuptial Agreements: An Update</u>, 8 J. Am. Acad. Matrim. Law. 1 (1992) (hereafter "<u>Perspectives</u> at ____."). Moreover, unlike the court in <u>Kahn</u>, we do not perceive a conflict between the rule announced in <u>Baker</u> and the statute providing for enforcement of antenuptial agreements entered into "knowledgeably." As we interpret the knowledge element of the statute, the spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent, and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings. Under the statute, disclosure or full knowledge is required in all cases, not just those which involve an agreement in which the provision for one spouse is wholly disproportionate to the means of the other spouse.

At least three principles support our interpretation of the rule. First, as was recognized in both <u>Baker</u> and <u>Kahn</u>, an agreement to marry gives rise to a

confidential relationship.[4]  As a result, the parties to an antenuptial agreement do not deal at arms' length and must exercise candor and good faith in all matters bearing upon the contract.[5]

Secondly, parties to an antenuptial agreement are very often ill-matched in terms of bargaining power.  As one court put it, "candor compels us to raise to a conscious level the fact that, as in this case, prenuptial agreements will almost always be entered into between people with property or an income potential to protect on one side and people who are impecunious on the other." Gant v. Gant, 329 S.E.2d 106, 114 (W. Va. 1985).  Thus, a rule requiring full disclosure or independent knowledge serves to level the bargaining field for the party in the weaker position.

Finally, unlike other private commercial contracts, the State has an interest and is a party to every marriage.  Gant, 329 S.E.2d at 114.  In the absence of antenuptial agreements, state laws govern the division of marital property and the awarding of alimony in the event of divorce.  Often, antenuptial agreements alter the rights parties otherwise would have under those state laws.  Consequently, it is altogether appropriate that parties entering into antenuptial agreements do so with knowledge of the holdings to which they are waiving any claim under state law. Fletcher, 628 N.E.2d at 1347.

---

[4] See also Newman v. Newman, 653 P.2d 728, 732 (Colo. 1982); Burtoff v. Burtoff, 418 A.2d 1085, 1089 (D.C. App. 1980); Del Vecchio v. Del Vecchio, 143 So. 2d 17, 21 (Fla. 1962); Frey v. Frey, 471 A.2d 705, 711 (Md. 1984); Fletcher v. Fletcher, 628 N.E.2d 1343, 1346 (Ohio 1994); Kosik v. George, 452 P.2d 560, 563 (Or. 1969); Button v. Button, 388 N.W.2d 546, 550 (Wis. 1986).

[5] Burtoff, 418 A.2d at 1089; Del Vecchio, 143 So. 2d at 21; Simeone v. Simeone, 581 A.2d 162, 167 (Pa. 1990).

As we view the statute, knowledge is simply an element that must be proven to establish the existence of a valid contract. Ordinarily, the burden of proving the existence of a valid contract is upon the person relying on the contract. In the context of antenuptial agreements, the same is true. The proponent has the burden of establishing the existence and terms of the agreement, as would be the situation in any other contractual setting. Lebeck v. Lebeck, 881 P.2d 727, 733 (N.M. App. 1994).

The extent of what constitutes "full and fair" disclosure varies from case to case depending upon a number of factors, including the relative sophistication of the parties, the apparent fairness or unfairness of the substantive terms of the agreement, and any other circumstance unique to the litigants and their specific situation. Perspectives at 25. While disclosure need not reveal precisely every asset owned by an individual spouse, at a minimum, full and fair disclosure requires that each contracting party be given a clear idea of the nature, extent, and value of the other party's property and resources. Id. Though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the agreement itself. See, e.g., Pajak v. Pajak, 385 S.E.2d 384, 388 (W. Va. 1989); Hartz v. Hartz, 234 A.2d 865, 871, n. 3 (Md. 1967) ("The careful practitioner has often caused to be prepared an itemization of the property covered by the agreement with appraised values and caused it to be made part of the agreement.").

In the absence of full and fair disclosure, an antenuptial agreement will still be enforced if the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the other spouse's property

-13-

and holdings.  Of course, the particular facts and circumstances of each case govern, to a great degree, the determination of knowledge.  Some factors relevant to the assessment include, but are not limited to, the parties' respective sophistication and experience in business affairs, the duration of the relationship prior to the execution of the agreement, the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel.  Perspectives at 18; see, e.g., Norris v. Norris, 419 A.2d 982, 985 (D.C. App. 1980); Del Vecchio, 143 So. 2d at 21; Simeone, 581 A.2d at 167.

Though representation by independent counsel may be the best evidence that a party has entered into an antenuptial agreement voluntarily and knowledgeably, no state makes consultation with independent counsel an absolute requirement for validity.  Perspectives at 18.   Some states, however, require that each party have the opportunity to consult with legal counsel of his or her own choice, but do not require actual consultation for the agreement to be upheld.  See, e.g., Gant, 329 S.E.2d at 116.  Finally, some states hold that the presence or absence of independent counsel is just another factor to be considered when determining if the agreement was entered into knowledgeably.  Perspectives at 22; see, e.g., Ex Parte Walters, 580 So. 2d 1352, 1354 (Ala. 1991); Matter of Benker's Estate, 331 N.W.2d 193, 198 (Mich. 1982).   It is in this last category that Tennessee is found.  Kahn, 756 S.W.2d at 695.

Applying the foregoing rules to the facts of this case, it is clear that the husband failed to prove the existence of a valid agreement.  There is no claim in this case that full and fair disclosure was provided to the wife.  Instead, the

husband claimed that the wife had full knowledge of the nature, extent, and value of his holdings at the time she signed the agreement. The record, however, does not support that claim. Although the wife resided with the husband for about a year before their marriage, he did not at anytime reveal to her the extent or value of his holdings. She was aware only of the nature of his business -- that he conducted a real estate business. Although their relationship was of a fair duration, she testified that she had only general knowledge of his holdings. Her testimony was corroborated by her husband and his attorney. From the record it appears the only business of which she had specific knowledge was a losing concern. Though specific appraisal values are not required to sustain the validity of an antenuptial agreement, knowledge of the proponent spouse's overall net worth is necessary. In terms of the comparative sophistication and business experience of the parties, the record clearly supports the trial court's conclusion that "Mr. Randolph was a learned businessman very shrewd in his dealings." The wife, in contrast, possessed no prior business experience or knowledge. Moreover, the agreement at issue was executed one day before the parties were married. The wife was presented with the agreement on the way to the attorney's office, at a time when she was in ill health. She had no opportunity to personally study the agreement or to seek advice from her own attorney or others close to her.

As we emphasized in Kahn, supra, consultation with independent counsel is not required and is merely one factor relevant to the assessment of knowledge, and to the extent the trial court's decision can be read to require such consultation, it is not approved. We have analyzed the record applying the foregoing rules and conclude that the evidence does not preponderate against

the trial court's finding that Virginia Randolph did not enter into the agreement knowledgeably.  Accordingly, the antenuptial agreement is unenforceable.

## CONCLUSION

Because we conclude that the evidence does not preponderate against the trial court's finding that Virginia Randolph did not knowledgeably enter into this antenuptial agreement, the Court of Appeals' judgment is reversed.  The judgment of the trial court is reinstated and this cause is remanded for further proceedings consistent with this decision, including assessment of attorney fees on appeal.  Costs of this appeal are taxed to the plaintiff, C.L. Randolph, for which execution may issue if necessary.

_____
RILEY ANDERSON, JUSTICE


**CONCUR:**

Birch, C.J.
Drowota, Reid, and White, JJ.