## IN THE COURT OF APPEALS OF TENNESSEE, AT NASHVILLE

FILED

March 13, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

|  |  |  |
|---|---|---|
| **DAVID PIKE d/b/a REALTY PARTNERS**, | ) ) ) | Williamson County Chancery Court No. 24980 |
| Plaintiff/Appellant, | ) ) | |
| | ) | C.A. No. M1999-00094-COA-R3-CV |
| VS. | ) ) | |
| **JOHN MAHER BUILDERS, INC.**, | ) ) | |
| Defendant/Appellee. | ) ) | |

From the Chancery Court of Williamson County at Franklin.
**Honorable Russ Heldman, Circuit Court Judge sitting as Chancellor**

**Joseph F. Rosenberg**, Nashville, Tennessee
Attorney for Plaintiff/Appellant.

**Tom Corts**,
**John C. Rochford**,
ORTALE, KELLEY, HERBERT & CRAWFORD, Nashville, Tennessee
Attorneys for Defendant/Appellee.

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

In this action for breach of contract, Plaintiff David Pike d/b/a Realty Partners ("Mr. Pike") appeals an order of the trial court dismissing his complaint against Defendant John Maher Builders, Inc. ("Mr. Maher"). For the reasons set forth below, the ruling of the trial court is affirmed in part, reversed in part, and remanded.

Mr. Pike is a real estate broker. Mr. Maher is the owner of a company that builds homes. On March 31, 1997, Mr. Pike and Mr. Maher entered into a writing entitled "Sales and Marketing Agreement" under which Mr. Pike agreed to sell and market Mr. Maher's homes in exchange for a five percent commission on the sale of any homes during the term of the contract, April 1, 1997 through March 31, 1998. Under the terms of this agreement, either party had the right to terminate for any reason upon sixty days written notice to the other party. On May 28, 1997, Mr. Maher's attorney sent a letter to Mr. Pike expressing his belief that Mr. Pike had breached the parties' agreement and notifying Mr. Pike that Mr. Maher was terminating the agreement.

In October of 1997, Mr. Pike filed a complaint against Mr. Maher requesting a judgment in the amount of all commissions due and payable to him for sales made prior to and during the sixty days immediately following May 28, 1997, the date on which Mr. Maher terminated the parties' Sales and Marketing Agreement. By consent, the trial court subsequently entered an order allowing Mr. Pike to supplement the complaint by adding a request for pre-judgment interest. After a hearing in December of 1998, the trial court found that Mr. Pike was not in breach of the parties' agreement, further found that Mr. Maher was in breach of the agreement, awarded damages to Mr. Pike in the amount of $36,321.73, and took the matter of pre-judgment interest under advisement. Mr. Maher filed a motion requesting that the court reconsider its ruling, accompanied by a brief in support of the motion. Additionally, both Mr. Pike and Mr. Maher filed motions to alter or amend the ruling of the trial court. After a hearing on the parties' post-trial motions in February of 1999, the trial court issued a memorandum opinion (1) granting Mr. Maher's motion to alter or amend, (2) denying Mr. Pike's motion to alter or amend, (3) vacating its initial ruling, and (4) adopting Mr. Maher's brief as its findings of fact and conclusions of law. The court then entered a judgment in favor of Mr. Maher and dismissed Mr. Pike's complaint. This appeal by Mr. Pike followed.

The issues raised on appeal, as we perceive them, are as follows:

1. Did the trial court err in finding that Mr. Pike breached the parties' agreement?

2. Did the trial court err in ruling that Mr. Pike is not entitled to receive a percentage of the commissions earned on certain sales contracts made prior to the termination of the parties' agreement?

To the extent that these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness. *See* T.R.A.P. 13(d). Accordingly, we may not reverse these findings unless they are contrary to the preponderance of the evidence. *See, e.g., Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); T.R.A.P. 13(d). With respect to the trial court's legal conclusions, however, our review is *de novo* with no presumption of correctness. *See, e.g., Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); T.R.A.P. 13(d).

Mr. Pike argues on appeal that he did not breach the parties' Sales and Marketing Agreement and that, consequently, Mr. Maher did not have the right to terminate the agreement without giving him at least sixty days written notice. The duties and obligations that Mr. Pike assumed under this agreement are as follows:

All and everything as outlined in a Marketing and Sales Program[1] containing four (4) pages and attached hereto as Exhibit A and incorporated herein as part of this contract as if copied verbatim herein.

In addition thereto and more specifically this sales and marketing agreement is contingent upon the continued involvement of George Schneider[2] in all phases of the sales and marketing program, including but not limited to, training of on-site agents, etc. for the entire term of this contract.

[Mr. Pike] will provide management and necessary sales personnel for training and support necessary to maintain an average of six (6) sales per month during the term of this sales and marketing

---

[1]The "Marketing and Sales Program" referred to in the agreement is an outline of a marketing plan which included guidelines regarding the training of Mr. Maher's sales agents.

[2]Mr. Schneider is a neighbor and friend of Mr. Pike, a real estate broker, and the vice-president of Radnor Builders.

agreement.

In adopting Mr. Maher's post-trial brief as its findings of fact and conclusions of law, the trial court determined that Mr. Pike breached that parties' agreement (1) because Mr. Schneider had not been continually involved in the sales and marketing program, (2) because Mr. Schneider had not made a sufficient effort to train Mr. Maher's sales agent, and (3) because Mr. Pike failed to hire additional agents to assist in the selling of Mr. Maher's homes.

At trial, Mr. Pike stated his belief that both he and Mr. Schneider did all that they were required to do under the parties' agreement. According to Mr. Pike, Mr. Schneider was involved in planning, training, and the development of a marketing plan. In an effort to promote Mr. Maher's properties, Mr. Pike advertised in a "For Sale By Owner" magazine, placed signs on the properties, listed the properties, and contacted some realtors. Cynthia Beard, Mr. Maher's sales agent, recalled that, on the occasions that Mr. Schneider visited her office, he worked a lot on the computer doing things such as designing logos and flyers. Although the parties originally contemplated that they would have weekly meetings, Mr. Pike and Mr. Schneider met with Mr. Maher regarding their marketing efforts on only three or four occasions. Mr. Pike testified that he met with Ms. Beard on approximately eight to ten occasions to talk with her, to train her, and to observe her talking with prospective customers. Ms. Beard testified, however, that Mr. Pike visited the office on only four or five occasions. Mr. Pike also spoke with Ms. Beard a number of times on the telephone. According to Ms. Beard, Mr. Pike did not do or say anything that helped her improve her sales technique. Using her desk calendar, Ms. Beard maintained a record of the amount of time that Mr. Pike and Mr. Schneider spent at her office. Referring to this calendar, Ms. Beard estimated that Mr. Schneider was in the office approximately four to five hours per week. Mr. Maher testified that, when Mr. Pike and Mr. Schneider were present in the office, only a small portion of their time was devoted to the training of Ms. Beard. Although Ms. Beard was in the office on a daily basis and available for training, Mr. Schneider spent a total of only four or five hours actually talking to, lecturing, or otherwise training her. Mr. Schneider observed Ms. Beard showing a house on one occasion and commented on her performance but did not offer any suggestions or criticisms that might help improve Ms. Beard's performance. Mr. Schneider testified that he observed and evaluated Ms. Beard's skills, assisted Ms. Beard in improving the model home, and engaged in

discussions with Ms. Beard regarding the improvement of her skills. According to Ms. Beard, she did not learn anything from Mr. Schneider that helped her sell Mr. Maher's homes. In a memo to Mr. Maher, Ms. Beard expressed her belief that she needed more training. Despite this memo, the amount or quality of Ms. Beard's training did not improve. Finally, it is undisputed that Mr. Pike did not hire any additional agents to assist with the selling of Mr. Maher's homes.

The proper construction of the parties' "Sales and Marketing Agreement" is a question of law.[3] *See, e.g., Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 5-6 (Tenn. Ct. App. 1998)(citing *Rapp Constr. Co. v. Jay Realty Co.*, 809 S.W.2d 490, 491 (Tenn. Ct. App.1991); *Taylor v. Universal Tire, Inc.*, 672 S.W.2d 775, 777 (Tenn. Ct. App. 1984)). After construing this agreement and making a determination regarding its requirements, the trial court was then required to consider whether Mr. Pike's performance was adequate under the terms of the agreement. The adequacy of Mr. Pike's performance is a question of fact requiring the court to evaluate the conflicting testimony of Mr. Pike, Mr. Maher, Mr. Schneider, and Ms. Beard. When a trial court's findings of fact are dependant upon determining the credibility of witnesses, they are entitled to great weight on appeal. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, when an issue hinges on witness credibility, the trial court's findings will not be reversed unless there is concrete and convincing evidence in the record other than the oral testimony of witnesses that contradicts these findings. *See Bowman*, 836 S.W.2d at 566.

In finding that Mr. Pike's performance was inadequate under the terms of the parties' Sales and Marketing Agreement, the trial court was apparently persuaded by the testimony of Mr. Maher and Ms. Beard regarding the involvement of Mr. Schneider in the sales and marketing of Mr. Maher's homes, the amount and quality of training received by Ms. Beard, and the failure of Mr. Pike to hire additional sales agents. After reviewing all of the evidence presented at trial, we are

---

[3]When construing the terms of a written agreement, the primary goal of the court is to ascertain and give effect to the intention of the parties. *See Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995); *Breeding v. Shackelford*, 888 S.W.2d 770, 775 (Tenn. Ct. App. 1994); *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn. Ct. App. 1992); *Park Place Ctr. Enters., Inc. v. Park Place Mall Assocs., L.P.*, 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992). In attempting to ascertain the intention of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996); *Rainey*, 836 S.W.2d at 119.

satisfied that the evidence does not preponderate against the trial court's conclusion that Mr. Pike was in breach of the parties' agreement on the date that Mr. Maher sent the letter of termination. Therefore, Mr. Maher was justified in terminating the parties' agreement. We affirm the ruling of the trial court with respect to this first issue.

Mr. Pike next contends that, even if he breached the parties' Sales and Marketing Agreement, he is nevertheless entitled to receive commissions resulting from certain sales contracts that were executed prior to Mr. Maher's termination of the agreement on May 28, 1997, including a contract with David and Carol Weber dated May 10, 1997, a contract with Carl Mulder dated May 11, 1997, and a contract with Jeffrey and Ann Trubey dated May 13, 1997. Attached to each of these contracts is a document entitled "Occupancy Agreement" executed by the buyer and Mr. Maher. On May 15, 1997, Mr. Maher faxed a letter to Mr. Pike notifying him (1) that he had obtained certificates of occupancy for the Weber, Mulder, and Trubey properties, (2) that, pursuant to Item (3) of the parties' agreement, he was terminating the listings of these properties, and (3) that Mr. Pike would not receive a commission on the properties. Item (3) provides in pertinent part as follows:

> [Mr. Pike] shall have until the Certificate of Occupancy is issued to sell any listed property and if not sold by that date the listing on said property may be terminated by [Mr. Maher] and a commission would not be due [Mr. Pike]. Failure on the part of [Mr. Maher] to terminate a listing after the Certificate of Occupancy is issued, does not constitute a waiver of [Mr. Maher's] right to terminate said listing at a later date or terminate listings on subsequent properties when the Certificate of Occupany[sic] is issued.

> It is understood that if [Mr. Maher] does a lease purchase contract on said property a commission would not be due and payable. It is also understood that if [Mr. Maher] does a transfer between its corporation and any of its officers individually, same will not be considered a sale of said property under this agreement and a commission would not be due and payable. Further, [Mr. Maher] shall have the option to build homes for friends or family members and a commission would not be due on said homes.

In refusing to pay the sales commissions requested by Mr. Pike, Mr. Maher first notes that certificates of occupancy[4] were issued for the Weber, Mulder, and Trubey properties on March

---

[4]A certificate of occupancy is a document issued by the Department of Building Inspection when construction of a home is totally finished and the home meets all of the

3, 1997, May 13, 1997, and May 1, 1997 respectively. Item (3) of the parties' agreement essentially provides that if a certificate of occupancy is issued for a property prior to its sale, Mr. Maher has the right to terminate the listing of that property and is not required to pay Mr. Pike a commission resulting from its subsequent sale. Thus, Mr. Maher could have exercised his right to terminate the listing of the Weber property, the Mulder property, or the Trubey property at any time between the date of the issuance of that property's certificate of occupancy and the date on which the property was ultimately sold. A contract for the sale of the Weber property was executed on May 10, 1997. A contract for the sale of the Mulder property was executed on May 11, 1997. A contract for the sale of the Trubey property was executed on May 13, 1997. Mr. Maher did not terminate the listings of the Weber, Mulder, and Trubey properties, however, until after these sales on May 15, 1997. We therefore conclude that the issuance of certificates of occupancy for the Weber, Mulder, and Trubey properties is not a proper basis for the denial of commissions earned by Mr. Pike in conjunction with the sales of these properties.

Mr. Maher also contends that he was entitled to deny the commissions requested by Mr. Pike because the buyers of the Weber, Mulder, and Trubey properties each executed a document entitled "Occupancy Agreement." Item (3) of the parties' agreement provides that "if [Mr. Maher] does a lease purchase contract on said property a commission would not be due and payable." It is Mr. Maher's position that the Occupancy Agreement executed in conjunction with the sales of the Weber, Mulder, and Trubey properties is equivalent to a lease purchase agreement.[5] Mr. Pike contends, however, that the Occupancy Agreement used by Mr. Maher is not equivalent to a lease purchase agreement but that it is essentially a sales contract with an extended closing date.[6] After examining the Occupancy Agreement used in the case at bar, Theodore Pailet[7] testified that it is

_____

requirements for occupancy.

[5]Mr. Maher explained that lease purchase agreements are used in a last resort type of situation when the construction of the home is finished but the property has not yet been sold. By leasing the property during the period of time that it remains unsold, the builder uses the rent received by the occupant to off-set the interest that accrues on the money that was borrowed in order to build the home.

[6]According to Mr. Pike, everyone in the real estate business understands that the term lease purchase agreement refers to a lease with an option to purchase the property at the expiration of the term of the lease.

[7]Mr. Pailet began working in the field of building and land development in 1955 and, since obtaining his license in 1970, has practiced as an attorney primarily in the area of real estate

similar to a document known as a "move-in agreement." Mr. Pailet explained that the purpose of a move-in agreement is to enable the buyer to move into the home prior to the closing. He further explained that a lease purchase agreement is similar to any other lease but gives the buyer an option to purchase the home within a certain period of time after the expiration of the lease. Finally, Mr. Pailet expressed his opinion that the Occupancy Agreement used by Mr. Maher does not have the same characteristics as a lease purchase agreement but, rather, appears to have the same purpose as a move-in agreement.

We agree with Mr. Pike and Mr. Pailet that the Occupancy Agreement used in the case at bar is not a lease purchase agreement. The Occupancy Agreement requires the buyer to pay Mr. Maher a "pre-closing occupancy deposit/non-refundable builders deposit" to be applied toward the buyer's down payment and closing costs. Additionally, under this agreement, the buyer agrees to close the purchase of the property no later than a certain date and may only extend the closing date upon payment of an additional non-refundable deposit. Finally, and most importantly, the agreement specifically provides that it "is intended only to give the Buyer the right of possession pending closing and is not intended to establish a Landlord and Tenant relationship." Thus, the Occupancy Agreement does not allow the buyer to lease the property and later exercise an option to purchase the property. Rather, it provides for penalties to be suffered by the buyer in the event that he or she breaches the agreement by failing to close the purchase. Because we are satisfied that the Occupancy Agreement is not a lease purchase agreement, we conclude that the execution of this agreement in conjunction with the sales of the Weber, Mulder, and Trubey properties did not entitle Mr. Maher to withhold from Mr. Pike the commissions earned with respect to these three sales.

Finally, we must determine the amount of the commissions that Mr. Pike is entitled to receive as a result of the sales of the Weber, Mulder, and Trubey properties. The parties' Sales and Marketing Agreement provides that "[Mr. Pike] shall receive as compensation a commission of five (5%) of the selling price on any home sold during the term of this contract." The parties have stipulated that five percent of the Weber sales contract is $8,295.00, that five percent of the Mulder sales contract is $8,345.00, and that five percent of the Trubey sales contract is $5,995.00. The sum

_____

law.

of these stipulated amounts is $22,635.00. Thus, we conclude that Mr. Pike is entitled to a judgment against Mr. Maher in the amount of $22,635.00.

Based on the foregoing, we affirm the trial court's conclusion that Mr. Pike was in breach of the parties' Sales and Marketing Agreement on the date that Mr. Maher sent a letter to Mr. Pike notifying him that the agreement was terminated. We reverse, however, the trial court's conclusion that Mr. Pike is not entitled to receive commissions resulting from the sales of the Weber, Mulder, and Trubey properties, which were consummated prior to Mr. Maher's termination of the agreement. On remand, the trial court is instructed to enter a judgment in favor of Mr. Pike and against Mr. Maher in the amount of $22,635.00. The costs of this appeal are assessed one-half to Mr. Pike and one-half to Mr. Maher, for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S.


_____
LILLARD, J.