IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 24, 2012 Session

## IN RE ESTATE OF CARL ROBIN GEARY, SR.

**Appeal from the Chancery Court for Grundy County**
**No. 20101114     Jeffrey F. Stewart, Chancellor**

---

**No. M2011-01705-COA-R3-CV - Filed February 28, 2012**

---

This appeal presents the issue of whether a widow who signed a prenuptial agreement is entitled to an elective share of her husband's estate. The evidence does not preponderate against the trial court's finding that the widow signed the prenuptial agreement knowledgeably. Given the validity of the prenuptial agreement, we affirm the trial court's decision denying the widow an elective share.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Edward Howard North, III, Manchester, Tennessee, for the appellant, Susan Geary.

Clinton H. Swafford, Winchester, Tennessee, for the appellees, Carl Robin Geary, Jr. and Rachel Geary Lawson.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Susan Geary ("Widow") and Carol Robin Geary, Sr. ("Decedent") signed a prenuptial agreement on November 14, 1996, the day they were married. No children were born of the marriage, but Decedent had two children from a previous marriage, Carl Robin Geary, Jr., and Rachel Geary Lawson (collectively, "Decedent's children"). Decedent died intestate on March 10, 2010.

The prenuptial agreement consists of six pages, with the fifth page containing the signatures of both parties, and the sixth page including only the notarizations of the two signatures. The introduction of the agreement includes the following pertinent statements:

WHEREAS, the parties have an exchange [sic] and reviewed financial statements, copies of which are attached as Exhibit A and B,[1] and both parties expressly agree that the disclosure set forth and financial statements is [sic] a full and adequate disclosure of their assets, estate, current earning, expectations and obligations, and they seek no further disclosure from the other party to enter into this Agreement, and

WHEREAS, the parties have resided at the same residence together for approximately eleven months and have adequate knowledge of each others assets and business affairs; and,

WHEREAS, both parties have been given the opportunity to seek independent counseling in connection with the preparation of this Agreement and have expressly waived such opportunity in writing with such a waiver not being a bar to either party seeking additional legal counsel; and

WHEREAS, both parties acknowledge that this Agreement is fair and reasonable based upon the facts and circumstances in existence at the time and execution of this Agreement and both parties accept the provisions in lieu of all rights which either party would otherwise have had against the other by virtue of the intended marriage . . . .

Section 2 of the agreement provides that each party retains his or her separate property "presently owned or hereinafter acquired as his or her absolute property without interference from the other party, as if the marriage had not taken place . . . ."

Section 3 of the prenuptial agreement provides as follows:

Both parties hereby disclaim as against the estate of the other, all statutory or common law rights, including but not limited to, all rights and claims regarding descent and distribution, homestead, dower, year's support, widow's allowance and rights of election to take against the will of the other party.

---

[1]These exhibits do not appear in the record.

On page five of the agreement, there appears the following provision concerning full disclosure:

> Each party acknowledges that he or she has been given a full and adequate disclosure of the assets, estate, current earnings, expectancies and obligations of the other party and neither party seeks further disclosure as to the value of the property listed in the exhibits attached to this Agreement.

In subsequent provisions, the parties acknowledged that each had sought independent counsel or was aware of the right to have independent counsel, and that each had read the entire agreement and was entering into it voluntarily.

Decedent's children filed a petition for letters of administration on May 10, 2010. On June 30, 2010, Widow filed a petition to set aside exempt property, year's support, and for an elective share; she denied that the prenuptial agreement was enforceable, arguing that she did not enter into the agreement knowledgeably.

*Hearing*

The matter was heard on May 19, 2011, and consisted of the testimony of three witnesses.

Decedent's daughter, Rachel Geary Lawson, testified that her father operated his trucking business out of his home and "pretty much kept his office on the kitchen table." She explained that there were employees working outside at the house every day with trucks coming and going. The truck drivers would turn in their tickets at the house every week. Equipment that needed repair or was not being used was often parked there. Decedent also had property at a busy intersection in town (about five miles away from the house) where some of his equipment would be parked. Ms. Lawson presented a number of checks from Decedent's business account which had been written and/or signed by Widow. Decedent's son, Carl Robin Geary, Jr., took the stand briefly to state that, if asked the same questions as his sister, his testimony would be consistent with hers.

Widow testified that she lived with Decedent in his house for about a year before they married. She gave testimony about the events preceding the signing of the prenuptial agreement:

> Q. Again, when was the first time that something was mentioned to you about a prenuptial agreement?

A. It was probably in the middle of October.

Q. Of '95?

A. 1996.

Q. Or 1996, I'm sorry.

A. Uh-huh. Yeah, it was just a couple of weeks before we got married.

Q. What did he tell you?

A. He sat me down and he said, "I don't want you to take this the wrong way," he [said], "But my first wife took me for a ride. She cleaned out my checking account, she cleaned out my savings account, she took the furniture, she took the new car." He said, "I started this business way before you come along," and he said, "I don't want you to take half of my business if you decide to divorce me or leave me." That was the end of that because I agreed to that. I didn't have a problem with that.

Widow testified that Decedent worried about his business and frequently told her it was "going under." According to Widow's testimony, Decedent told her that the prenuptial agreement would apply only in the event of their divorce.

Widow gave the following description of the actual signing of the prenuptial agreement:

Q. Tell the Court about . . . going to the ceremony.

A. Um, [Decedent] and I got into his mother's car, and as we were driving towards Tracy he said, "I got that prenup from Nelson that we had discussed." He said, "We're going to stop by the bank to sign it." We get to the bank, we get out, we go into the bank, he hands it to me, and it's two sheets of paper, and he says, "This is the prenup that we discussed about my business." We had it notarized. I signed it, he signed it, it was notarized. We got in the car and we got married. We went straight to the courthouse and got married.
. . .

-4-

Q. And the antenuptial agreement is six pages, and you said you saw two?

A. He handed me two sheets of paper.

Widow acknowledged that she signed the agreement and stated that she did not seek legal counsel.

As to her knowledge about the trucking business at the time of the marriage, Widow testified:

> I knew he had some trucks, I knew he had some trailers, and I knew he had a loader, but I couldn't say at any given time exactly what he had, how many, the worth of them, or anything. I did see them coming in and out, but I couldn't tell you if I was seeing the same one or if I was seeing a different one, you know.

Widow stated that Decedent told her from the beginning that his business account and his little blue bag for bank deposits were off limits to her, and she never looked at his business accounts or bank statements.

*Trial court's decision*

The trial court took the case under advisement and reconvened on June 3, 2011, to issue its findings and decision. In its detailed findings, the court noted that Widow had worked full time in the home health field throughout the marriage and that Decedent ran his business separately out of the home. The court concluded that Widow "during those eleven months prior to the time of their marriage, could clearly see the extent and nature of the business that he had." The court found:

> As to its dollar value, I think [Widow] testified she didn't know what its dollar value was. She testified that she didn't know what the volume of the business was, that is its gross revenues. But she did hear him speak often about how little money he made, that expenses were too high, the cost of gas was too much; everything was driving his profitability down.

The court noted that Widow signed and filled out some checks on the business account but testified that she did not have complete access to the bank statements. The court further noted, however, that there was testimony that the "bank statements were sitting out on the kitchen table."

The court found no evidence of fraud or duress contributing to Widow's signing of the prenuptial agreement. On the key issue of Widow's knowledge about the extent of Decedent's holdings at the time of the signing of the agreement, the court found as follows:

> And so the question about whether it's–she signed it knowledgeably is one that I think this Court would have to find that she knew all that she needed to know that he owned a business, that he wanted to keep that business separate. That was the asset. As to its value, there was the opportunity to inquire to know prior to the signing of it more if she had chosen to. And so I think in light of the fact that holding that all that I needed to determine was whether she was knowledgeable about the Antenuptial Agreement and what it encompassed prior to her execution of it. I find that she was indeed knowledgeable, she had every opportunity to learn more, and that there was no undue influence imposed upon her, nor any duress to make her sign it. That she signed it freely, knowledgeably, and in good faith because I think she acknowledged that she knew that he wanted to keep the asset separately. So I would have to find then in favor of the estate who asserted the Antenuptial Agreement and that they have carried their burden of proof in that regard.

In a final order entered on June 27, 2011, the court incorporated the findings of fact and conclusions of law from the June 3, 2011 hearing. Consistent with these findings, the court ruled that the prenuptial agreement was "legally valid and both parties are bound by its provisions."

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn.1999).

ANALYSIS

The enforceability of a prenuptial agreement is governed by Tenn. Code Ann. § 36-3-501, which states:

> Nothwithstanding any other provision of law to the contrary, except as provided in § 36-3-502, any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having

-6-

jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses *freely, knowledgeably and in good faith and without exertion of duress or undue influence* upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

(Emphasis added). The burden of proof is on the party seeking to enforce the prenuptial agreement to establish the necessary elements. *Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996). The establishment of each element "is a question of fact to be determined from the totality of the circumstances surrounding the negotiation and execution of the antenuptial agreement." *Boote v. Shivers*, 198 S.W.3d 732, 741 (Tenn. Ct. App. 2005). In this case, the disputed issue is whether Widow entered into the prenuptial agreement knowledgeably.

In *Randolph v. Randolph*, our Supreme Court defined what it means to enter into a prenuptial agreement "knowledgeably":

[T]he spouse seeking to enforce an antenuptial agreement must prove, by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

*Randolph,* 937 S.W.2d at 817. Thus, there are two methods for proving that a prenuptial agreement was entered knowledgeably: a "full and fair disclosure" or independent knowledge. *Id.* This case is unusual in that the prenuptial agreement refers to the exchange of disclosure forms,[2] but the case was tried on the basis of independent knowledge. We will, therefore, confine our discussion to the independent knowledge theory. A determination of whether a spouse had independent knowledge depends on the facts and circumstances of each case. *Id.* at 822. Our Supreme Court has described factors to be considered in this analysis:

Some factors relevant to the assessment include, but are not limited to, the parties' respective sophistication and experience in business affairs, the

---

[2]These forms do not appear in the record.

duration of the relationship prior to the execution of the agreement, the time of the signing of the agreement in relation to the time of the wedding, and the parties' representation by, or opportunity to consult with, independent counsel.

*Id.*

This issue in this case, then, is whether Decedent's children proved that Widow had "independent knowledge of the full nature, extent, and value of the proponent spouse's holding." *Id.* at 817. This is a factual issue, and the trial court made detailed findings of fact, quoted above. The court found that, during the eleven months preceding the parties' marriage, when Widow lived with Decedent, Widow "could clearly see the extent and nature of the business that he had." The court noted that Widow heard Decedent discussing his business, which he ran out of the house, that she "signed and filled out some checks on the business," and that Decedent "had the one asset which was the trucking business, which I said was clearly visible at all times." Moreover, Decedent talked to Widow of his desire to have a prenuptial agreement weeks prior to the execution of the agreement. The court found that Widow "knew all that she needed to know that he owned a business, that he wanted to keep that business separate." As to the value of the business, the court emphasized that "there was the opportunity to inquire to know prior to the signing of it more if she had chosen to."

The evidence does not preponderate against the trial court's factual findings, which indicate that Widow knew the nature and extent of Decedent's business holdings and had the opportunity to learn more prior to signing the prenuptial agreement. Widow argues that she did not have adequate knowledge of the value of Decedent's assets. The trial court heard Widow's testimony that she did not know the dollar value of Decedent's business assets, and the trial court's findings reflect the credibility and weight the court afforded to Widow's testimony concerning her knowledge about Decedent's trucking business. A trial court's findings regarding credibility are given great deference by appellate courts because the trial court "observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). We "will not reevaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

As the trial court noted in its review of the caselaw, the nature of the asset(s) involved is significant in determining knowledgeability. *See, e.g., Estate of Baker v. King*, 207 S.W.3d 254, 266-70 (Tenn. Ct. App. 2006) (burden of proof not met that wife had full knowledge of husband's assets; she was unaware that he had rental house, did not know the value of his gas station business or other assets). In *In re Estate of Cooper*, No. M2009-01290-COA-R3-CV, 2010 WL 844778, at *4-5 (Tenn. Ct. App. Mar. 9, 2010), the only asset

involved was a house and 18 to 20 acres of land, property that the widow knew about at the time she signed the prenuptial agreement; the court found that the decedent had made a full and fair oral disclosure of his assets. The trial court in this case found that Widow was familiar with the nature and extent of Decedent's holdings and the general state of the business by virtue of her exposure to the business during the eleven months prior to the parties' marriage. The evidence does not preponderate against the trial court's implicit conclusion that, under the circumstances involved in this case, Widow's knowledge of Decedent's holdings and state of the business was enough to give her an adequate understanding of the value of his business.

We find the *Randolph* case, relied upon by Widow, to be distinguishable from the present case. The husband in *Randolph* never revealed to the wife, prior to the marriage, "the extent or value of his holdings." *Randolph*, 937 S.W.2d at 822. She knew only that he was in the real estate business and had only general knowledge of his holdings. *Id.* Moreover, while the husband was a "learned businessman very shrewd in his dealings," the wife had no business experience or knowledge; and she executed the prenuptial agreement when she was in ill health. *Id.* Under the circumstances in *Randolph*, the Court determined that the evidence did not preponderate against the trial court's determination that the wife did not enter into the agreement knowledgeably. *Id.* In the present case, Widow had the opportunity to learn of the nature and extent of Decedent's business first hand. There is no evidence that she lacked the ability to understand the nature of Decedent's business or that she was ill on the day the prenuptial agreement was signed.

Finally, we must note that, even if Widow did not see all of the pages of the prenuptial agreement, the page she signed included several key provisions in which she acknowledged that she had "been given a full and adequate disclosure of the assets, estate, current earnings, expectations and obligations" of Decedent, that she either had received the independent advice of counsel or was aware of her right to receive independent counsel, and that she had read the entire agreement and "it is fair and equitable and that it is being entered into voluntarily."

Under the facts as found by the trial court, we cannot say that the evidence preponderates against the court's determination that Widow entered into the prenuptial agreement knowledgeably.

CONCLUSION

The decision of the trial court is affirmed. Costs of appeal, for which execution may issue if necessary, are assessed against Susan Geary, appellant.

_____

ANDY D. BENNETT, JUDGE