MoKiNNEY, J.,
delivered the opinion of the court.
*451 This was a bill filed in the chancery court at Franklin, for the settlement and distribution of the estate of James Swanson, sr., who died intestate on the 25th of March, 1850. The intestate, at the time of his- death, was owner of a large estate, both real and personal, situate, in part, in this State, and in part, in Mississippi. He left surviving him, the complainant, who is his widow, but no child, or the issue of such, born in lawful matrimony.
The defendants are his natural sons and daughters, bom long prior to his marriage with the complainant, and claim, by legitimation, the right of inheritance and succession to his estate. And this right, asserted by them, which is not admitted by the bill, gives rise to the principal question for our determination in the cause.
In the discussion here, the question is properly narrowed down to the enquiry, whether or not, the defendants are, by law,* entitled to succeed to the jpersonal estate, under the statutes of distribution; their right of inheritance, as respects the real estate, not being seriously questioned.
The incapacity of defendants to take, as distributees, in this case, is placed upon two grounds: The first rests upon the peculiar phraseology of the act of 1844, ch. 211. The second is, that the legal effect of the legitimation relied on by the defendants, was merely to confer upon them the capacity to take, as heirs, and not as distributees, of their putative father, the intestate.
These objections to the competency of the defendants to take the personal estate, however plausible at the first view, are not tenable. First: The act of 1844 declares, “that hereafter, when any person shall die intestate, leaving no legitimate child, or children, or the descendants of such, living, but leaving a widow; then, and *452 in tbat case, ■ the said widow shall be entitled, after the payment of all just debts, to the whole of the personal estate, absolutely, of her deceased husband, in addition to the dower of real estate, as heretofore allowed by law.”
It is argued, that, by force of the word, “ legitimate,” in this act, the intention .is sufficiently manifest, that in favor of the widow, a child or children of the intestate, not born in lawful wedlock, should be excluded altogether ; and consequently, that, under the statute, legitimation confers such natural child, or children, no right of succession whatever,, as against the widow.
This construction is wholly inadmissible. It would be to make the statute wholly inconsistent with the general law, providing for the legitimation of natural children; and as to all cases, falling within the act of 1844, would render legitimation, a mere idle ceremony, of no effect whatever. The word, “ legitimate,” as used in this statute, is obviously put in opposition to illegitimate, and not in contradistinction to legitímate children. And in this view, it can have no force or effect, whatever, in the construction of the act. It is a mere expletive, and altogether unnecessary to have been used; because, by the established principle of the common law, as also, of our statutes of descent and distribution, illegitimate children were excluded from all right of inheritance and succession.
We proceed, then, to consider the validity and effect of the alleged legitimation of the defendants, and the extent of the rights thereby conferred upon them. In this investigation, we can derive but little aid from the common law. The doctrine of the civil law, upon the subject of the legitimation of bastards, was never admitted into the common law of England. Its introduction, we learn, was attempted by the bishops in the reign *453 of Henry the III. But, it was sternly and successfully resisted by the barons; not so much upon principle, as has been said, as from their extreme jealousy of the civil law, and utter unwillingness to yield to its superiority over the common law, in any respect.
By the Roman law, there are two modes by which children, illegitimate by birth, may be rendered legitimate. Tire one is, per subsegiiens mai/rimonium; the other, rescripto prineipiis; by the subsequent marriage of the parents, or by the letters of the Sovereign. See Burge’s Colonial Law, vol. 1, p. 92.
But by the stern principles of the common law, a child born out of lawful matrimony, is a bastard, notwithstanding the subsequent marriage of the parents. He is treated as the son of nobody; has no inheritable blood; is denied all rights, of whatever nature, founded on a claim of kindred; and is regarded as having no rights, except such as he can personally acquire; even the right of a sirname, he can acquire only by reputation, and when thus acquired, it serves in law, only as a description of the person; and, hence, he cannot take otherwise than merely by the description and name gained by reputation; 1 Bl. Com., 459.
In England, there is only one possible mode in which a bastard may be made legitimate, and that, in the language of Blackstone, is, “ by the transcendent power of an act of Parliament, and not otherwise.” An instance of legitimation, in this mode, is given in the reign of Richard the II, in the case of the Duke of Lancaster’s children, born before marriage; 1 Bl. Com., 459; 2 Kent Com., 209.
The severity of the common' law, in its condemnation of the policy of legitimation, has been a good *454 deal relaxed in several of the American States. And this proceeds upon the principle that the relation of parent and child, which may exist, in all its natural force, between the putative father and his innocent, though illicit offspring, ought to be permitted, at the will of the parent, to carry with it all the legal consequences of that relation.
In this State, and several other States have adopted the same rule, a bastard may take the estate of the mother, (dying intestate, leaving none other than illegitimate children,) under the general rules of descent and distribution. So, in several of the States, statutes have been passed, adopting the principle of the civil law, by which children, born before marriage, are legitimated by the subsequent marriage of their parents. And, in a number of the States, general laws exist for the legitimation of natural children, and in some, including this State, numerous private acts have been passed, from time to time, to legitimate particular individuals born out of lawful wedlock; 1 Bouvier’s Inst., 133, 135.
The competency of the legislature, by general laws, to provide for the legitimation of bastards, is not questioned; nor could the power of the legislature to pass private laws, legitimating particular individuals, have admitted of any question prior to the prohibition against special legislation, introduced into the amended Constitution of this State in 1834, Article XI, § 7. v
The legitimation of persons born out of lawful wedlock, is to be regarded, then, not only as a settled, but likewise as rather a favored policy, in the legislation of this, and other States of the Union. And, therefore, the courts, in the exposition of statutes conferring this right» *455 whether they be general or private acts, are to give them at least a fair and reasonable, if not a liberal construction.
In the case under our consideration, two of the defendants claim to have been made legitimate by a private act of the legislature, passed on the 26th of July, 1820, which enacts “that the names of James Nail and Mary Nail, illegitimate children of James Swanson, of Williamson, be, and the same are hereby changed to that of James Swanson and Mary Swanson; and they are hereby enabled to inherit, in the same manner as if they had been born in lawful wedlock.”
The other two defendants were declared legitimate by a proceeding in the common law and chancery court of the city of Memphis, on the petition of said James Swanson, sr., in proper person, pursuant to the general law of 1805, ch. 2. That statute empowers the court, on the petition of any person wishing to make any child, not born in wedlock, legitimate, and an heir, or joint heir, to his, or her estate, to alter the name of such illegitimate person, and to declare “ that said person, made legitimate as aforesaid, has become heir, or joint heir, of the person petitioning.”
The order and decree of said court directs, that the name of Oataline Burk, be changed to that of Cataline Swanson; and that the name of James Monroe Whi-tees, be changed to that of Monroe Swanson, “and that they be, and are hereby constituted heirs and joint heirs 'at law of the said James Swanson, the petitioner, being legitimated upon his petition, and rendered capable of inheriting from him, and of being his distribu-tees, as if they, and each of them had been born in lawful wedlock.”
*456 The position assumed by tlie complainant’s counsel is, tbat tbe legitimation of the defendants, in either of the foregoing modes, confers upon them, at most, simply the capacity to take as heirs, and not as next of hin, under the statute of distribution.
It is unquestionably true, that the defendants have no inheritable capacity, except such as may have been, either expressly, or by necessary implication, conferred upon them by law.
The private act, legitimating two of the defendants, entitles them “to inherit in the same manner as if they had been born in lawful wedlock.” And, by the public act of 1805, under which the other two defendants were declared to be legitimated, they are constituted ‘•'■’heirs or joint heirs” of their putative father. A rigid adherence to the strict letter of both these acts, would certainly lead to the conclusion maintained by the counsel for the complainant; but such literal construction would obviously be in direct opposition to the fair meaning and intention of the legislature.
We need not, for the decision of the present case, stop to notice the well settled distinctions, in the rules of construction, between public and private statutes; for as much as, in our view, the public and private acts under consideration, as respects the extent of the right conferred by them, respectively, on the defendants, must be governed by the same primary and fundamental rule of construction, alike applicable to both, namely, the intention of the lawgiver. And the real intention, when accurately ascertained, will always prevail over the literal sense of terms; 1 Kent’s Com., 462. The rule, that technical words are to be taken to have been used in *457 a technical sense, though generally true, is not so, when it clearly appears that they were intended to be applied differently from this legal acceptation; lb.
The words, “inherit,” and “heir,” in this- technical sense, relate to right of succession to the real estate of a person dying intestate. And when used in a statute, as well as in a will, or other instrument, they will be taken to have been employed in their legal sense; but a clear intention to the contrary, will repel this presumption, and control the legal operation of words however technical; 6 Cr. Dig., 148; 2 Wills, on Ex., 926.
As our notions on the subject of legitimation are derived, in a great measure, from the civil law, there is much plausibility in the suggestion, that the words, “inherit,” and “heir,” in the acts before referred to, were intended to be understood in the sense of that law. Among' the civilians, by mheritcme<?, is understood the succession to all the rights of the deceased; and, the title heir is applied indiscriminately to every person called to the succession, and he is entitled to all the estate of the deceased, whether it be real or personal; Story’s Confl., § 507.
But, this consideration aside; we take it to be a correct principle, that the same rule of construction, applicable in this respect, to a will or other instrument, should be applied in the construction of a statute, whether public or private. And, with respect to a will, it .is well settled, that when the word “heirs” is used to denote succession or substitution, it may be understood to mean such persons as would legally succeed to the property according to its nature and quality. Thus a legacy of personal property to A, and, in case of his death before the testator, to his heirs, was decreed *458 to belong to tbe next of lam-, of A, wlio died before ■ the testator; 2 "Will, on Ex., 950. Such is the settled rule, with respect to the personalty, whenever it clearly ■ appears, that the testator has employed the term “heir,” not in its strict and proper acceptation, but in a lax sense, as descriptive of the person appointed by law to succeed to property of this description; 2 Jar. on "Wills, 22. So, under the description of personal estate, the freehold has been held to pass, where it was clear from the face of the will, that the testator meant, not what is technically understood by the words used, but the real property over which he had an absolute power of disposition; 2 Wills, on Ex., 925.
It is not allowable to suppose that the legislature deliberately intended to bestow upon natural children, the more important privilege and capacity of taking by inheritance, the real estate of their father, and to deny them the less valuable right of succession to his personal estate; or, in other words, to make such children legitimate for the one purpose, and leave them bastards as to the other.
But again: we do not think it essential, that the statute should, in express terms, have declared the right . of the person legitimated, to take as next of kin, under the statute of distributions. This results, by implication of law, from his being constituted a legal heir.
When placed by law, in the state and condition of heir, and invested with the character and capacity of • heir, all the rights, privileges and legal consequences incident to that relation and character, are tacitly conferred; and, consequently, the right of succession to the personal estate of the intestate.
*459 We are of opinion, therefore, that in virtue of the acts of legislation above mentioned, tbe defendants respectively are invested with the right of inheritance and succession to the estate of James Swanson, the intestate, personal as well as real.
Another question has been made, respecting the rights of the complainant to certain slaves owned and possessed by her, at the time of her marriage with James Swan-soil, the intestate. For some .time previous to said marriage, which took place in October, 1847, the complainant was the widow of William B. Theobald, who died in 1844. By his last will and testament, said Theobald devised and bequeathed to the complainant, all his estate, both .real and personal, during her natural life, “ one half of which is to be at her disposal at her death, the other half I bequeath to my sister, Mary Thomas, and her bodily heirs, except Madison, (a slave,) which is to be set free at my wife’s death, provided for at her disposal; provided lie make her a faithful and obedient servant; if not, she is' to dispose of him as she thinks proper.”
In December, 1844, the complainant was duly qualified in the county court of Maury, as administratrix with the will annexed, of her late husband’s estate. Immediately preceding her marriage with the intestate, Swanson, she made a settlement of her administration, and, in October, 1848, some twelve months after said marriage, she resigned said administration, and James Swanson, the intestate, was appointed administrator, with the will annexed, in her stead.
It is not shown that, on the settlement of her administration, in October, 1847, which was two days prior to her marriage with the intestate, there remained any debts *460 or liabilities due or unsatisfied, against the estate of said Theobald. Said estate consisted, in part, of a number of slaves, which, prior to, and at the time of, complainant’s marriage with the intestate, Swanson, were in her possession ; and, after said marriage, passed into possession and control of Swanson, and so remained up to the period of his death, in March, 1850.
On the foregoing facts, we are of opinion, that the complainant must be presumed to have assented to the bequest in her favor of the slaves in question; and thereby she became vested with a life interest in the whole of said slaves, and her absolute interest in a moiety of them. Such was the relation in which she stood to the property, at the time of her marriage with Swanson. And the legal consequence is, that so far as respects the life interest of complainant in said slaves, at the time of her marriage, the marital right of the husband attached, he thereby become owner of the life interest in the whole of the slaves; and, on his death, this interest passed to his legal representatives. But, as to the absolute interest of the complainant in moiety of the slaves, the marital right of the,husband did not attach, on the ground that there had been no division of the slaves. TJntil division, she had no complete, specific right to any individual slave, or number of.slaves; and, therefore, the marital right could not attach upon the remainder interest, as held in a ease precisely similar in its facts; Hall vs. McLain, 11 Humph., 425.
As respects the slave, Madison, no decree will be made at present. It is contingent whether he is to be free, or to be disposed of by the complainant; and the rights of the parties will be reserved until the happening of the contingency. Decree affirmed.