# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

# IN RE: ESTATE OF MARGUERITE MONGOLD CRANOR

**Direct Appeal from the Chancery Court for Sumner County**
**No. 95P-133     Tom E. Gray, Chancellor**

---

**No. M1997-00231-COA-R3-CV - Decided April 4, 2000**

---

This appeal involves a dispute over a sizeable estate.  After learning that they had been excluded from their relative's will, thirteen of the testatrix's heirs challenged the will in the Chancery Court for Sumner County on the grounds of improper execution, lack of testamentary capacity, and undue influence.  The proponents of the will asserted that the contestants lacked standing because their challenge, even if successful, would only revive an  earlier will from which they had likewise been excluded.  The trial court found that the contestants had standing but, following a bench trial, determined that the contestants had failed to prove their improper execution, lack of testamentary capacity, or undue influence claims.  On this appeal, the contestants take issue with the decision to uphold the will; while the proponents take issue with the conclusion that the contestants had standing to challenge the will.  We have determined that the contestants had standing to challenge the will and that the trial court properly determined that the will should be admitted to probate in solemn form. Accordingly, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded.**

KOCH, J., delivered the opinion of the court, in which TODD, P.J., M.S., and BUSSART, SP. J., joined.

James R. Tomkins and Robert H. Jennings, Jr., Nashville, Tennessee, for the appellants, Henrietta Darr Johnson, Charles Rimlinger, Carol Dodson, Candy Rucker, and Gayle Squires.

Howard E. Frasier, Jr., Bowling Green, Kentucky, George H. Cate, Jr. and Herman D. Bradley, Nashville, Tennessee, and Bryce C. Ruth, Jr., White House, Tennessee, for the appellees, Potter Children's Home, Mary Dix, Harold H. Cole, George F. Cranor, Sr., George F. Cranor, Jr., Jarman Cranor, II, and White House Church of Christ.

## OPINION

Margaret Mongold Cranor lived for many years in White House, Tennessee with her husband, Jarman Cranor.  The Cranors were well-known and respected in the community,  and during their marriage they accumulated extensive real estate holdings in Sumner and Robertson Counties. Mr. Cranor died in January 1990.  Ms. Cranor was left to fend for herself with the

assistance of friends and neighbors. Ms. Cranor, who by all accounts was an independent, outgoing woman, took over the management of the properties and businesses that had been managed by her husband before his death.

As time passed, Ms. Cranor's thoughts turned increasingly toward the disposition of her estate following her death. Because she and her husband had no children, she wished to distribute part of the estate to accomplish her husband's wishes to recognize the people who had befriended and helped her, and to benefit the community. She did not intend to leave her property to any of her blood relatives because she had only sporadic contact with them after her husband's death.

In mid-1993, Ms. Cranor asked Harold H. Cole, a lawyer practicing in White House, for assistance in preparing her will. On July 6, 1993, Ms. Cranor executed a will leaving her estate to her brother-in-law,[1] two acquaintances,[2] others identified in a separate document referred to as "Schedule A," and to a trust called "The Mongold Trust" whose purpose was to enable the White House Church of Christ to "assist the impoverished persons of this White House area only." Ms. Cranor's first will contained three other provisions of note. First, it stated that Ms. Cranor forgave all debts owed to her at the time of her death. Second, it contained an in terrorem clause conditioning the bequests on the recipients' refraining from contesting the will.[3] Finally, it named Mr. Cole as Ms. Cranor's sole executor and as one of the trustees of The Mongold Trust.

Ms. Cranor was dissatisfied with the first will, and so she executed a second will on July 19, 1994. Mr. Cole assisted her with the preparation of this will, as he had done one year earlier with

---

[1]Consistent with the desires of her late husband, Ms. Cranor bequeathed six parcels of real property in Sumner and Robertson Counties to George F. Cranor, Sr., her late husband's brother.

[2]Ms. Cranor bequeathed to Mary Dix, a friend and business associate, one parcel of real property and the furniture, equipment, and supplies from the business they operated together, the supplies and material in Ms. Cranor's home, and a certificate of deposit held in both their names at Dominion Bank. Ms. Cranor also bequeathed a restaurant and adjoining real property to Dorothy Collier who operated a restaurant where the Cranors frequently took their meals and who provided meals to Ms. Collier during the later years of her life. Ms. Cranor included this bequest in her will in accordance with her late husband's wishes, notwithstanding her disapproval of the relationship between Mr. Cranor and Ms. Collier.

[3]These conditions are enforceable in Tennessee. *See Tate v. Camp*, 147 Tenn. 137, 146, 245 S.W. 839, 841 (1922); *Alexander v. Rhodes*, 63 Tenn. App. 452, 463, 474 S.W.2d 655, 660 (1971). However, similar provisions will not be enforced against persons who have reasonable grounds to contest a will under all relevant circumstances. *See Winningham v. Winningham*, 966 S.W.2d 48, 51, 53 (Tenn. 1998). This provision plays no role in this case because none of the contestants received bequests in any of Ms. Cranor's three wills.

the first will. In this will, Ms. Cranor increased the bequest to her brother-in-law,[4] changed the bequests to Ms. Collier[5] and Ms. Dix,[6] and made new bequests to Nancy Milligan[7] and Limozine Harris.[8] Like the first will, the second will left the residue of Ms. Cranor's estate to The Mongold Trust. It also contained the provisions forgiving all individual debts owed to Ms. Cranor at the time of her death and providing for forfeiture of the bequest of any person who challenged the will. Ms. Cranor again named Mr. Cole as her sole executor but named Ms. Dix as executrix if Mr. Cole was unable to serve.

On October 5, 1994, approximately three months after executing her second will, Ms. Cranor executed a third will, again with the assistance of Mr. Cole. This will changed the bequests to George Cranor, Sr.,[9] Dorothy Collier,[10] Mary Dix,[11] and Nancy Milligan.[12] In addition, it made new bequests to Richard Blackman,[13] Vivian Brinkley,[14] the White House Church of Christ,[15] and Potter

---

[4] George Cranor, Sr. received two additional pieces of property as well as $100,000 in cash.

[5] Ms. Collier received a life estate in the restaurant property and $20,000. Ms. Cranor left the fee simple interest in the restaurant property to Ms. Collier's daughters subject to their mother's life estate.

[6] The bequest to Ms. Dix remained essentially unchanged, except that Ms. Cranor specifically bequeathed her jewelry to Ms. Dix in the second will.

[7] Nancy Milligan received a house and furnishings in White House, Ms. Cranor's dog "Puppy," and $5,000.

[8] Limozine Harris received $5,000.

[9] Ms. Cranor changed and increased the number of parcels of real property being bequeathed to George Cranor, Sr. and made the gift jointly to Mr. Cranor and his two sons. She also directed that George Cranor, Sr. should receive her "IMIT accounts" but removed the bequest of $100,000 that had been included in her second will.

[10] Instead of receiving a life estate in the restaurant property, Ms. Collier received the fee simple interest in the property. Ms. Cranor also increased the cash bequest to Ms. Collier from $20,000 to $50,000.

[11] Ms. Dix received two other pieces of real property, including Ms. Cranor's house and furnishings. The bequests of personal property to Ms. Dix remained essentially unchanged, except for the bequest of jewelry in the second will was not repeated in the third will.

[12] Ms. Milligan received a different piece of real property.

[13] Mr. Blackman, a renter who had assisted Ms. Cranor, received two parcels of real property
(continued...)

Children's Home.[16]  Like her earlier wills, Ms. Cranor's third will placed the residue of her estate into The Mongold Trust for the benefit of the White House Church of Christ.  It also contained the provisions regarding the forgiveness of individual debts owed to her at the time of her death[17] and to deter her devisees from challenging the will.  The third will named Mr. Cole and Ms. Dix as co-executors.

Ms. Cranor died on April 21, 1995.  Less than one month later, Mr. Cole and Ms. Dix filed a petition in the Chancery Court for Sumner County to probate her third will in solemn form.  Between June and October 1995, thirteen of Ms. Cranor's blood relatives[18] objected to the probate of this will, alleging that Ms. Cranor lacked testamentary capacity, that the will had been procured with undue influence, and that it had not been properly attested.  In September 1995, the trial court appointed an administer ad litem for Ms. Cranor's estate.  In November 1995, the administrator ad litem filed Ms. Cranor's second will with the trial court, and one month later, the executors filed Ms. Cranor's first will with the court.

The proponents of Ms. Cranor's October 1994 will sought to dismiss the challenges to the will on the ground that the contestants lacked standing because, even if they were successful in challenging the October 1994 will, they would inherit nothing from Ms. Cranor because they had been likewise excluded from her first and second wills.  The contestants responded that they were challenging the validity of all three wills and that Ms. Cranor's estate would pass to them under the laws of intestate succession if they succeeded.  The trial court determined that the contestants had standing, and this court declined to review the trial court's standing decision because it was not a final, appealable judgment.  *See In re Estate of Cranor*, No. 01A01-9606-PB-00261 (Tenn. Ct. App. June 21, 1996), *reh'g denied*, 1996 WL 406779 (Tenn. Ct. App. July 12, 1996).

---

[13](...continued)
and $50,000.

[14]Ms. Brinkley, a neighbor whose husband had worked for Ms. Cranor's husband, received $1,000.

[15]The White House Church of Christ received $200,000.

[16]Potter Children's Home received $100,000.

[17]This provision takes on more significance because of Ms. Cranor's decision between the execution of her second and third wills to give Mr. Cole $100,000, ostensibly to offset income he lost because he was no longer sole executor.  Mr. Cole structured this arrangement as a loan by executing a note to Ms. Cranor for $110,000, knowing that this "debt" would be forgiven in Ms. Cranor's will.

[18]The contestants included three of Ms. Cranor's half-uncles on her mother's side, three first cousins on her father's side, and seven second cousins on her father's side.

On February 12, 1997, Mr. Cole resigned as a co-executor of Ms. Cranor's estate and as a trustee of The Mongold Trust. The trial court conducted a bench trial from March 18 through March 20, 1997. The contestants elected to call no witnesses during the trial. At the conclusion of the proceedings, Ms. Dix announced that she desired to resign as the executrix of Ms. Cranor's estate. The trial court accepted both Ms. Dix's and Mr. Cole's resignations and directed that the administrator ad litem continue to serve as the personal representative of Ms. Cranor's estate. The trial court also ruled extemporaneously that Ms. Cranor was capable of making a will in October 1994, that the October 5, 1994 will has been properly executed, and that the October 5, 1994 will had not been obtained by undue influence. On March 31, 1997, the trial court filed a final judgment declaring the October 5, 1994 will to be Ms. Cranor's valid last will and testament and directing that it be admitted to probate in solemn form. Five of the thirteen contestants have now appealed to this court.

## I.
### THE CONTESTANTS' STANDING

Even though they prevailed on the merits, the proponents of the October 1994 will have renewed their assertion that the contestants lacked standing to contest the will. While Tenn. R. App. P. 13(a) permits them to raise this issue, we are somewhat puzzled by the tactic because the appellants' success on the standing issue will inevitably require us to vacate the judgment admitting the will to probate in solemn form. It is not without some irony that we conclude that the contestants alleged sufficient facts to support the trial court's April 1996 order finding that they had standing to challenge all three wills.

The proponents first questioned the contestants' standing to challenge Ms. Cranor's third will before her first two wills were filed with the trial court. They asserted that the contestants should not be permitted to challenge the third will because they had not produced an earlier will naming them as beneficiaries. After the first and second wills were filed in the trial court, the proponents renewed their standing argument by pointing out that the contestants had been excluded from all three wills and that they had still failed to produce a will naming any of them as beneficiaries.

The contestants did not attempt to respond to the standing arguments by offering a will purporting to leave them anything. Indeed, it would have been impossible for them to do so because, if anything in this record is clear, it is that Ms. Cranor set out to make sure that none of her blood relatives received any of her real or personal property when she died. Instead, the contestants adopted another strategy which, had it succeeded, would have been equally effective. After Ms. Cranor's first and second wills were filed in the trial court, they asserted that none of Ms. Cranor's wills were valid. The contestants anticipated that if they could prove that Ms. Cranor died without a valid will, they would receive her real and personal property under the laws of intestate succession.

Accordingly, the contestants took aim at the validity of all three wills. They asserted that the third will had not been properly executed, that Ms. Cranor lacked testamentary capacity when she executed it, and that it was procured by undue influence exerted by Mr. Cole. They attacked the second will by asserting that Ms. Cranor had revoked it on September 25, 1994 and that the will left

the residuary estate to a trust that had not been legally established when the will was signed. Finally, they challenged the first will by asserting that Ms. Cranor had told Mr. Cole that she did not intend this document to be her last will and testament and because it undertook to distribute real and personal property in accordance with a hand-written document called "Schedule A" which was not attached to the will and which, in fact, had not been drafted when the first will was signed.

When the trial court addressed the standing issue in April 1996, it did not have the benefit of the evidence that was later adduced at the trial in March 1997. Based on the evidence before it, the trial court properly concluded that the validity of Ms. Cranor's third will was yet to be adjudicated and that the contestants had presented substantial evidence[19] and colorable legal arguments to support their claims that Ms. Cranor's first and second wills were invalid. Accordingly, we cannot fault the trial court for concluding, based on the record as it then existed, that the contestants had demonstrated a sufficient stake in the outcome to afford them standing to challenge all three of Ms. Cranor's wills.

Once the trial court had decided the standing question, the parties' focus shifted back to the wills themselves. Everyone connected with the proceeding understood that the validity of the first and second wills would become germane only if the trial court found that Ms. Cranor's third will was invalid and, thus, that the validity of the three wills would be taken up in reverse order. Accordingly, Ms. Cranor's third will became the primary focus of the proceeding. During the March 1997 trial, practically all the evidence and the parties' arguments were directed toward the validity of the October 1994 will.

The fact that the October 1994 will became the focus of the later proceedings in this case does not undermine the trial court's earlier standing decision. The trial court was never required to address Ms. Cranor's first and second wills because it found her third will was valid. However, had the trial court found otherwise, the record contained sufficient evidence obtained during discovery to provide factual support for the contestants' arguments that Ms. Cranor's first and second wills were suspect either in whole or in part. Thus, looking back at the record now, the trial court's decision to uphold the validity of Ms. Cranor's third will may very well be the only impediment to a conclusion that Ms. Cranor died intestate either in whole or in part. With the proceeding in this posture, we cannot fault the trial court's conclusion that the contestants had standing to contest all three of Ms. Cranor's wills.

## II.
### THE EXECUTION OF THE THIRD WILL

---

[19]The factual basis for the challenges to Ms. Cranor's first and second wills were strong because they were based on the deposition testimony of Mr. Cole who has assisted Ms. Cranor in the preparation and execution of these two instruments.

The contestants assert that Ms. Cranor's will was not executed in accordance with Tenn. Code Ann. § 32-1-104 (1984). They base their claim solely on the testimony of one of the attesting witnesses who stated that she did not realize that she was signing Ms. Cranor's will when she signed the document on October 5, 1994. The trial court concluded that the witness was "honestly mistaken" about the sequence of events when Ms. Cranor executed her will. We have concluded that the record does not provide us a basis for second-guessing the trial court's conclusions regarding the witness's credibility or for concluding that the evidence preponderates against the trial court's conclusion that Ms. Cranor's third will was properly executed.

## A.

We turn first to the proper standard of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court itself following a bench trial, the now familiar standard in Tenn. R. App. P. 13(d) governs our review. Accordingly, we must review the record de novo and must presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We must also give great weight to a trial court's factual findings that rest on determinations of credibility. *See Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). We may disregard a trial court's findings of fact based on credibility determinations only when the record contains clear and convincing evidence to the contrary. *See Thompson v. Creswell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996).

Reviewing findings of fact under Tenn. R. App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. *See Coles v. Wrecker*, 2 Tenn. Cas. (Shannon) 341, 342 (1877); *Hohenberg Bros. Co. v. Missouri Pac. R.R.*, 586 S.W.2d 117, 119 (Tenn. Ct. App.1979). There is a "reasonable probability" that a proposition is true when there is more evidence in its favor than there is against it. *See Chapman v. McAdams*, 69 Tenn. 500, 506 (1878); 2 *McCormick on Evidence* § 339, at 422 (John W. Strong ed., 5th Practitioner's ed.1999). Thus, the prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *See Bryan v. Aetna Life Ins. Co.*, 174 Tenn. 602, 611, 130 S.W.2d 85, 88 (1939); *McBee v. Bowman*, 89 Tenn. 132, 140, 14 S.W. 481, 483 (1890); *Chapman v. McAdams*, 69 Tenn. at 503.

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *See Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App. 1995); *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987). Because of this presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *See Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.

**B.**

Shortly before she signed her third will on October 5, 1994, Ms. Cranor telephoned Wilma Roaden, a long-time friend and neighbor, and June Kirkwood, a home health nurse who had first met Ms. Cranor in July 1994, to request that they witness her will. On the afternoon of October 5, 1994, Mses. Roaden and Kirkwood were joined at Ms. Cranor's house by Mr. Cole and Mr. Dee Reid, a notary public, who was present at Mr. Cole's request to notarize the signatures and the attestation clause. On that occasion, Ms. Cranor signed her will, and Mses. Roaden and Kirkwood signed an attestation clause stating:

> Signed by the said Marguerite Mongold Cranor as and for her Last
> Will and Testament, consisting of four pages including this page, in
> the presence of us, the undersigned, who at her request and in her
> sight and presence, and in the presence of each other, have subscribed
> our names as attesting witnesses the day and date above written.

Thereafter, Mr. Reid notarized Mses. Roaden's and Kirkwood's signatures on the attestation clause and on the affidavit attached to the will prepared in accordance with Tenn. Code Ann. § 32-2-110 (1984).

After the dispute over Ms. Cranor's will arose, the lawyer for one of the contestants obtained an affidavit from Ms. Kirkwood regarding her memory of the execution of Ms. Cranor's will. While she confirmed that her signature was on the will, she insisted that she and Ms. Roaden did not sign the attestation clause or the affidavit in each other's presence, that she believed that she was only signing a document attesting to Ms. Cranor's competency to make a will, and that Ms. Cranor could not have signed the document on October 5, 1994 because she broke her hip earlier that morning and would have been unable to execute a will on that date. Ms. Kirkwood stated that she believed that she had signed the document three weeks to one month earlier.

Ms. Kirkwood elaborated on her affidavit in a February 1996 deposition. She stated that she was fifteen minutes late getting to Ms. Cranor's house because of problems with another patient. When she arrived, Ms. Cranor, Ms. Roaden, Mr. Cole, and Mr. Reid were in the kitchen, and Ms. Roaden was getting ready to leave. She also stated that all the others had already signed the document before she arrived and that she hurriedly signed the document without reading it. She also repeated that all these things occurred sometime in September 1994 rather than in October and that no one told her before or when she signed the instrument that it was anything other than a paper certifying that Ms. Cranor was competent to make a will.

When called at trial, Ms. Kirkwood essentially repeated her account of the events at Ms. Cranor's home. She recalled that Mses. Cranor and Roaden did not sign the instrument in her presence and that no one told her that the document she signed was Ms. Cranor's will. However, she conceded that she had been mistaken about the date that Ms. Cranor had broken her hip, and that Ms. Cranor would have been physically capable of signing her will on October 5, 1994.

Messrs. Cole and Reid and Ms. Roaden also testified concerning the events of October 5, 1994 in Ms. Cranor's home. All three agreed that Ms. Kirkwood arrived after everyone else had assembled in Ms. Cranor's kitchen, that Ms. Cranor signed the document in everyone's presence, that Mses. Roaden and Kirkwood signed the attestation clause and affidavit in each other's presence, and that Mr. Reid notarized the signatures after everyone had signed the document. With regard to the nature of the document being signed, Messrs. Cole and Roaden testified that Ms. Cranor responded to Mr. Cole's question that she was ready to sign her will. Ms. Roaden could not remember that statement but testified that she knew Ms. Cranor was signing her will because Ms. Cranor had specifically invited her to her house on that occasion to witness her will.

The presence of an attestation clause in a will creates a rebuttable presumption that the recitations in the attestation clause regarding the will's execution are true and correct and that the will was properly executed. *See Whitlow v. Weaver*, 478 S.W.2d 57, 63 (Tenn. Ct. App. 1970); *In re Estate of Ross*, 969 S.W.2d 398, 400 (Tenn. Ct. App. 1997). Thus, any effort by an attesting witness to undermine the accuracy of the recitals in a duly signed attestation clause should be viewed with suspicion. *See Whitlow v. Weaver*, 478 S.W.2d at 62.

In light of the testimony of all the persons present when Ms. Cranor signed her will, the trial court had ample ground for concluding that Ms. Kirkwood was honestly confused about the events transpiring on October 5, 1994 and that she was honestly mistaken in her recollection regarding the nature of the instrument being signed and the order in which everyone signed the instrument. The same clear and convincing evidence that supports the trial court's determination of the credibility of Ms. Kirkwood's testimony also provides ample support for the trial court's conclusion that the manner in which Ms. Cranor's will was executed satisfied the requirements of Tenn. Code Ann. §§ 32-1-104 and 32-2-110. Accordingly, we have no basis to overturn the trial court's conclusion that Ms. Cranor's October 5, 1994 will was properly executed.

## III.
### MR. COLE'S INFLUENCE ON MS. CRANOR

The contestants' final challenge to Ms. Cranor's October 5, 1994 will is based on their belief that Mr. Cole took advantage of his confidential relationship as Ms. Cranor's lawyer in order to benefit himself at their expense. The trial court concluded that Mr. Cole did not unduly influence Ms. Cranor's decisions regarding the disposition of her estate. While Mr. Cole's conduct may be open to question, we agree with the trial court's conclusion that the proponents of the will presented clear and convincing evidence that the October 5, 1994 will was the product of independent and unconstrained choice and will of Ms. Cranor herself.

### A.

A valid will is the product of the free exercise of independent judgment by a person who has the mental capacity to make a testamentary disposition. A will is presumed valid once its proponents prove that it was properly executed. Thus, proof of due execution shifts the burden of going forward

to the contestants to prove that the testator was unduly influenced in making his or her will. *See In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987); *Owen v. Stanley*, 739 S.W.2d 782, 787 (Tenn. Ct. App. 1987), *overruled on other grounds*, *Matlock v. Simpson*, 902 S.W.2d 384, 386 n.10 (Tenn. 1995).

Contestants may carry their burden of proving that the testator was unduly influenced by proving the existence of suspicious circumstances warranting a conclusion that the will was not the testator's free and independent act. *See Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989); *Taliaferro v. Green*, 622 S.W.2d 829, 835-36 (Tenn. Ct. App. 1981), *overruled on other grounds*, *Matlock v. Simpson*, 902 S.W.2d 384, 386 n.9 (Tenn. 1995). Whether the circumstances relied upon by the contestants are sufficient to invalidate a will should be "decided by the application of sound principles and good sense to the facts of each case." *Halle v. Summerfield*, 199 Tenn. 445, 454, 287 S.W.2d 57, 61 (1956). Once the contestants present sufficient evidence to substantiate their undue influence claim, the proponents of the will must present clear and convincing evidence that the challenged transaction or testamentary disposition was fair. *See Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995); *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977); *Bills v. Lindsay*, 909 S.W.2d 434, 440-41 (Tenn. Ct. App. 1993).

The courts have not attempted to catalogue the types or number of suspicious circumstances needed to invalidate a will. The scope of permissible proof is quite broad. *See* 1 Jack W. Robinson, Sr. & Jeff Mobley, *Pritchard on the Law of Wills and the Administration of Estates* § 130 at 209-30 (5th ed. 1994). Without direct evidence of undue influence, persons contesting a will must prove the existence of more than one suspicious circumstance in order to succeed. *See Halle v. Summerfield*, 199 Tenn. at 455, 287 S.W.2d at 61. In will contest cases, the contestants commonly make out their undue influence claim by proving the existence of a confidential relationship between the testator and beneficiary, the testator's physical or mental deterioration, or the beneficiary's active involvement in procuring the will. *See Mitchell v. Smith*, 779 S.W.2d at 388-89.

**B.**

The contestants' undue influence claim in this case focuses on the relationship between Ms. Cranor and Mr. Cole, her lawyer, not the relationships between Ms. Cranor and any of the persons receiving specific bequests of real or personal property in her will. They assert that Mr. Cole had a confidential or fiduciary relationship with Ms. Cranor because he provided her with legal and estate planning advice over a sixteen month period. They also assert that Mr. Cole personally benefitted from this relationship because he "borrowed" $110,000 from Ms. Cranor in September 1994 and then included a provision in her October 5, 1994 will forgiving all individual debts owed to her at the time of her death.

The only evidence of the relationship between Ms. Cranor and Mr. Cole comes from Mr. Cole himself. He explained that he and his wife had known the Cranors for years but that he did not begin actively representing Ms. Cranor until mid-1993 when she asked for his assistance in preparing a standard form lease for her rental property and for some estate planning assistance. Mr. Cole did not keep track of his time during the entire period that he represented Ms. Cranor and never sent her

a bill for his services because she had told him to "take all of this out of my estate." According to Mr. Cole, the issue of fees was discussed only one time early in their relationship. Ms. Cranor asked Mr. Cole about the fee he would receive as the executor of her estate, and Mr. Cole told her that a court could approve a fee equal to five percent of the estate. Ms. Cranor responded that a fee of $100,000 would be acceptable to her.

The subject of the executor's fees resurfaced in mid-1994 when Mr. Cole was preparing Ms. Cranor's third will. According to Mr. Cole, Ms. Cranor expressed some concern about the diminished fee he would receive if she followed his suggestion to name Ms. Dix as co-executor. As he recounts it, Ms. Cranor told him that she wanted him to have $100,000 because he had helped her and he was the only person she could trust. She first told him that she wished to include a $100,000 bequest to him in her will. Mr. Cole asserts that he told Ms. Cranor that her idea "won't work" and "will bring on too many problems" because he was already preparing the will and would also be serving as a co-executor and one of the trustees of The Mongold Trust. Then, according to Mr. Cole, Ms. Cranor proposed to give him $100,000 outright. In response to this proposal, Mr. Cole offered to pay her eight percent interest because he knew she could use the cash flow for her other businesses. When Ms. Cranor agreed, Mr. Cole prepared a $110,000 promissory note dated September 26, 1994 and gave the note to Ms. Cranor in return for a check for $110,000.[20]

## C.

Based on Mr. Cole's testimony, no conclusion can be drawn other than that a confidential relationship existed between Ms. Cranor and Mr. Cole from June 1993 through April 1995. There is likewise little question that Mr. Cole benefitted personally from this relationship because Ms. Cranor "gave" him $110,000 in September 1995. Mr. Cole himself asserts that neither he nor Ms. Cranor viewed these funds as a gift, nor as a substitute for any fees he might claim for his legal work or serving as Ms. Cranor's co-executor.[21] Thus, the contestants made out a prima facie showing of undue influence that shifted the burden of going forward to the proponents of the will to demonstrate by clear and convincing evidence that Mr. Cole did not substitute his judgment for Ms. Cranor's in the preparation of the October 5, 1994 will.

---

[20]Notwithstanding the promissory note and the interest payments, Mr. Cole continues to insist that both he and Ms. Cranor viewed the $110,000 as a gift. Mr. Cole recounted that the "tax people" had advised him that the donor would be required to file a gift tax return in 1995 and to pay the required gift tax. According to Mr. Cole, Ms. Cranor did not object when he informed her that she would be required to pay the gift tax because "if it didn't go for that tax, it would go for inheritance tax."

[21]The October 5, 1994 will provided for a fee to Ms. Cranor's executors of a fee equal to five percent of her gross estate. In addition, Mr. Cole later sent a statement for services rendered to the administrator ad litem requesting payment for forty hours of professional services at the rate of $75 per hour.

The trial court concluded that the proponents of the October 5, 1994 will presented clear and convincing evidence that Mr. Cole's relationship with Ms. Cranor did not affect her testamentary decisions. It found nothing suspicious in Ms. Cranor's disinclination to leave any part of her estate to her blood relatives in light of their lack of interest in her following her husband's death.[22] In addition, it found clear and convincing evidence that Ms. Cranor was in complete control of her faculties, that she enjoyed conducting her business, and that she had been consistent and precise about how she desired to arrange her affairs. Her instructions to Mr. Cole from June 1993 through October 1994 were precise and consistent. Throughout the entire process, she had three goals in mind: first, to fulfill the desires of her late husband; second, to make sure that all the property she and her husband accumulated during their marriage went to her husband's brother and his children; and third, to distribute the remainder of her property, consisting mostly of property she had inherited, to charity and to the friends who had helped and supported her following her husband's death.

While Mr. Cole's dealings with Ms. Cranor are questionable, the "gift" transaction should be viewed as separate from the will. The only connection between them is the debt forgiveness clause in the will. That clause, when given effect, excuses Mr. Cole from any further liability on the promissory note. The clause might assume controlling importance had it appeared in Ms. Cranor's will for the first time after Mr. Cole executed the promissory note. However, there is no question that Ms. Cranor included similar clauses in her first and second wills. Accordingly, it seems plain that Ms. Cranor had a settled intention to forgive her individual debtors over one year before her $110,000 "gift" to Mr. Cole.

Based on the record, we concur with the trial court's finding that the proponents introduced clear and convincing evidence that Mr. Cole did not unduly influence Ms. Cranor with regard to the specific bequests of property in her will. Even if we were disposed to disagree with the trial court concerning the debt forgiveness clause, which we are not, the result, as far as the contestants are concerned, would be the same. Invalidating the debt forgiveness clause because of Mr. Cole's abuse of his confidential relationship would not invalidate the entire will. *See Harrison v. Morton*, 32 Tenn. (2 Swan) 460, 467 (1852); 1 Jack W. Robinson, Sr. & Jeff Mobley, *Pritchard on the Law of Wills and the Administration of Estates* § 128, at 207 (5th ed. 1994). At most, the clause itself would be rendered invalid, and debts owed to Ms. Cranor at the time of her death would, when collected, pass under the residuary clause of her will.

**IV.**

---

[22]The absence of familial bonds of love and affection are borne out by the attitude of the contestants following Ms. Cranor's death. One relative remarked that it was not "convenient" for her to attend Ms. Cranor's funeral because "she was going to have to change plans" and because "there's nobody else there to say I'm sorry about anything to." After learning that Ms. Cranor had not left her anything in her will, the same relative thought "boy, I'm glad I didn't knock myself [out] to go down there, because she didn't leave me a dime."

We affirm the judgment admitting the October 5, 1994 will of Marguerite Mongold Cranor to probate in solemn form and remand the case to the trial court for further proceedings. We tax the costs of this appeal, jointly and severally, to Henrietta Darr Johnson, Charles Rimlinger, Carol Dodson, Candy Rucker, and Gayle Squires and their sureties for which execution, if necessary, may issue.