# 0IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 4, 2014 Session

## BRENDA DIANNE COOK RAYFIELD v. TONY DALE RAYFIELD

**Appeal from the General Sessions Court for Blount County**
**No.5-17409      Robert L. Headrick, Judge**

---

**No. E2013-00745-COA-R3-CV-FILED-MAY 6, 2014**

---

This appeal arises from a divorce action. The husband appeals the trial court's division of marital property and debt and the award of compensatory and punitive damages to the wife for injuries she allegedly sustained at the hands of the husband. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Kevin W. Shepherd, Maryville, Tennessee, for the appellant, Tony Dale Rayfield.

Craig L. Garrett, Maryville, Tennessee, for the appellee, Brenda Dianne Cook Rayfield.

## OPINION

### I. BACKGROUND

Brenda Dianne Cook Rayfield ("Wife") and Tony Dale Rayfield ("Husband") married in December 1994. It was the third marriage for both. The couple remained married for 16 years. Wife filed her complaint for divorce on August 30, 2010. At the time the marriage ended, Wife was 60 and Husband was 52.

#### Property

Each party came into the marriage with items of separate property. Wife owned a

home located at 1203 Scenic Hill Drive in Louisville, Tennessee. She had resided there since 1982. The home had been owned by Wife and her prior husband, and she received it in a 1991 divorce.

Wife also owned an apartment complex consisting of four buildings, known as "Little River Heights" in Rockford, Tennessee. The complex totaled 22 units, but apparently one building had suffered some water damage and the six units in it were not rentable. According to Wife, no major improvements had been made to the apartments during the marriage except a new roof. She claimed the apartments were not in good shape as of the date of the divorce hearing. Wife indicated that the apartments came into the marriage with debt but always generated cash flow – the debt owed on them was paid out of the rental income they produced. She stressed that no money from the marital estate had ever been spent on the apartments. Wife testified that in 2011, approximately 16 units per month were rented at the rate of $425 per month. At the time of trial, Wife only had 8 units rented.

Husband came into the marriage with a business he held as a sole proprietorship, known as East Tennessee SuperVac. This business primarily provided maintenance, parking lot sweeping, landscaping, and snow removal services for Tanger Outlet Mall ("Tanger") in Pigeon Forge, Tennessee, on a year-to-year contract. The couple worked together at the business during the marriage, grossing over $400,000 on an annual basis.

Husband and Wife lived a comfortable lifestyle. Wife had several cosmetic surgery procedures, including a tummy tuck, leg lift, and face lift with brow lift. Husband had liposuction performed. They borrowed $150,000 to remodel and upgrade the Scenic Hill Drive house. In February 2007, they purchased a home at 1216 Crest Hill Drive in Louisville, adjacent to the home Wife already owned.

## IRS Debt

Despite having significant cash flow, Husband and Wife – each blaming the other – failed to pay their taxes to the Internal Revenue Service ("IRS") for tax years 2000-2007. In November 2009, they were notified that a tax obligation was due in the amount of $422,000. Wife subsequently began satisfying the IRS obligation. From February 5, 2010, through March 16, 2012, she paid the IRS $441,232.87. Husband does not dispute that Wife made all of these payments.[1]

---

[1]Wife attempted to obtain an agreement with the IRS whereby she could pay in installments, but Husband would not fill out the required Form 433.

In order to secure the funds to repay the IRS, Wife refinanced the Scenic Hill Drive home through Citibank and obtained $190,000. Due to the high interest rate on the Citibank loan, Wife refinanced again with First Tennessee Bank to obtain a lower interest rate. During the refinancing process, it appears that Husband's name was placed on the deed to Wife's house without her knowledge. She related at trial that she did not know how that happened and never had any intention of putting Husband's name on the deed to her home. Wife also paid two payments of $20,000 and $55,000 to the IRS in May and June of 2011 from money she had inherited during the marriage. Wife inherited $60,000 from her mother and $189,000 from her cousin. She related that a series of $2000 payments she made to the IRS were paid by monies she earned during 2011 and 2012, after the parties separated.

During the time period that Wife was addressing the tax obligations, the Scenic Hill Drive home suffered fire damage. On April 27, 2011, at approximately 4:00 a.m. while Wife was asleep, a fire started in the basement of the home. Wife used the insurance proceeds from her fire claim to pay $90,000 to the IRS in January 2012.

Several hours later, on the same day, Wife's house also was severely damaged during a wind and hail storm. Damage to the home included broken windows in the front of the house and considerable damage to the exterior deck and roof. Wife paid the IRS $50,000 in insurance proceeds from the storm damage claim in March 2012.

As Wife used the insurance proceeds to pay the IRS, the repairs to the Scenic Hill Drive home were incomplete at the time of trial. Wife had made repairs to the home as she was able, using her own income and credit cards. The repairs included having Servpro gut the entire basement, her bedroom, and a bathroom down to the studs. At the time of the trial, Wife reported that the sheetrock had been replaced but had not been finished and painted. She had also replaced the windows and the back deck. According to Wife, the house still had a damaged roof.

To make what Wife believed to be the final payment to the IRS, she borrowed $20,000 from her best friend, Judy Moss, shortly before the trial. Wife testified that she had not been notified that the debt was satisfied, and she acknowledged that an amount might be left owing. The total amount paid to the IRS by Wife was $441,223.87.

**Affair**

Wife related that it was during Summer 2010 when she became suspicious that Husband was having an affair. According to Wife, Husband was often absent from work at Tanger without explanation. She stated she found unexplained receipts from cabin rentals

and noticed that Husband would hide in the shower or closet to use his phone. Wife also observed that Husband would sit out in his vehicle texting for long periods after he came home from work. She began reviewing her spouse's e-mails and text messages, at which time her suspicions were confirmed when she discovered e-mails containing professions of love between Husband and Jessica Valentine. Wife asserted that she confronted Husband when she learned that he was planning to divorce her. Later that summer, when Husband was away on a trip, Wife moved his possessions out of the marital home into the Crest Hill Drive house. The separation occurred on July 28, 2010. During the pendency of the divorce, Wife continued paying the Crest Hill Drive mortgage payments, despite Husband moving Ms. Valentine into the home.

## Assault

Prior to her filing of the divorce complaint, Wife claims that on August 23, 2010, Husband assaulted her. Wife alleged that she was in her Scenic Hill Drive home around 3 p.m. when Husband arrived, rang the doorbell, and asked to pick up some tools and a guitar. Wife stated that she told him she would not let him in and "to let the court settle" such issues. According to Wife, Husband became enraged, shoved his way into her home, grabbed her by her hair, threw her down some stairs, slammed her head against the steps, threatened her, swung a decorative statue at her, and told her that he was going to "bash her brains in." She related that Husband had his hands over her face, and she was finally able to get free from him when she bit his finger. She called 911, along with her best friend Ms. Moss. Wife claimed that while the police were at her house, she received a text message from Husband that stated, "I'm so sorry . . . forgive me and my wrongs." However, she could establish no proof of the text. Ms. Moss testified that she was unaware of the text message.

Dr. Roger Gaddis, an emergency clinic physician, evaluated Wife on August 23, 2010, at 4:35 p.m. She advised him that she had been involved in an altercation with Husband and was pushed down the stairs and hit with a statue. He found swelling in her right jaw and a loose lower right bridge in her mouth. While her injuries required no treatment by him, he acknowledged that the knots on the back of her head and the bruising on her right jaw were recent in origin and had occurred, in his opinion, within the previous 1-2 days. He diagnosed Wife with a clinical impression of assault.

Dr. David Rudder, Wife's dentist, saw her approximately eight days after the incident. Dr. Rudder opined that tooth 28 in Wife's right lower jaw had a definite fracture and that her bridge required replacement. He admitted that he could not tell the court how long the fracture in tooth 28 had been there or what caused it. Wife's treatment lasted several months and required a root canal and the placement of implants.

At trial, Husband claimed the assault never happened. He asserted that within a few weeks of the alleged incident, he had been required to call the police twice. Husband stated that someone had broken into his truck and stolen his phone. According to Husband, Wife later admitted that she had committed the break in. Shortly thereafter, Husband contended that he called the police again because Wife was kicking the back door and throwing bottles against his house. Husband asserted that after kicking the door several times, Wife had fallen backward down the deck steps. He claimed this incident occurred approximately four days before the alleged assault.

Husband and his co-worker, John Bernard, related similar stories of the events of August 23, 2010. They claimed it was 2:30 p.m. when they clocked out at Tanger. Traveling in two vehicles, they first went to O'Reilly's Auto Parts in Seymour to get a belt for a compressor they had removed from work and were taking to Husband's home. They drove to Crest Hill Drive to unload the compressor and "fiddle" with it for a few minutes. Husband also retrieved a payroll check out of his mailbox that Wife had placed there earlier. Bernard subsequently left, and Husband drove to a bank about seven miles away to cash the check. The back of the check revealed that it was processed by the bank at 3:29 p.m.

Husband denied ever going to Wife's home during the relevant time frame. He testified that he called her after leaving the bank to thank her for the payroll check, at which time a police officer answered. Husband stated he drove straight home to wait for the police. The officer, upon arrival, commented on Husband's bandaged finger as proof of the assault. Husband informed the officer that his finger was injured three or four days earlier at work and that Wife was aware of that fact. Nevertheless, he was arrested and thereafter served with an order of protection.

Due to the order of protection, Husband was unable to return to work at East Tennessee SuperVac. Bernard, however, continued to work there. During that time, Bernard asserted that Wife threatened him and other staff that they would be fired if they talked to Husband. Bernard claimed that Wife subsequently approached him and offered him $25,000 to cut Husband's brake lines. According to Bernard, when he came to court with Husband on one occasion and was seen by Wife, she fired him.

### Jessica Valentine

Husband observed at trial that the couple's marriage had been nothing more than a "business relationship" for approximately five years prior to the separation, with each sleeping in separate bedrooms. He admitted to the romantic relationship with Ms. Valentine, but he claimed their first sexual encounter was after he moved out of the marital residence.

Husband conceded that the parties separated on July 28, 2010, and that the e-mails introduced at trial were dated June 5 and 6, 2010, but he claimed the e-mails wherein he and Ms. Valentine professed their love for one another and their plans to divorce their spouses occurred before he and Ms. Valentine ever had sex. He further admitted that he bought jewelry for Ms. Valentine, including a ring, two necklaces, and earrings, but he could not relate the exact prices for the items. Husband acknowledged that he opened an account at a jewelry store in October 2010, and ran up the account balance to $4,374. He stated that not all of that total was spent on Ms. Valentine, suggesting that some of the jewelry purchases were for his mother. At the time of the divorce hearing, Ms. Valentine was living with him at Crest Hill Drive. He acknowledged that she was not paying any rent or utilities and that he was buying their groceries.

Wife called Ms. Valentine as a witness. The 25-year-old admitted that she had been living with Husband at Crest Hill Drive. She testified that she and Husband had been dating since August 2010. She claimed that she and Husband first became sexually involved around that same time, despite the romantic e-mails dated June 5 and 6, 2010. Ms. Valentine stated that when she began the relationship with Husband, she was under the impression that he was ready to start divorce proceedings against Wife. Ms. Valentine, who also was married at the time, left her husband and obtained a divorce in December 2010. She admitted that she and Husband had discussed marriage and that Husband had bought several items of jewelry for her, including two necklaces, a silver ring, and a tennis bracelet, and had taken her on trips. Ms. Valentine acknowledged that while living with Husband, she paid no rent or utilities and that he bought the groceries.

Ms. Valentine testified in support of Husband's claim that Wife came to the Crest Hill Drive house a few days before the purported assault and started kicking the doors. She related that Wife was yelling, calling her names such as "Fat Bitch," and saying that she wanted to kill Ms. Valentine. According to Ms. Valentine, she did not observe whether or not Wife fell, but she heard broken glass hitting the house during the incident.

On June 11, 2012, Wife was awarded a divorce on the grounds of inappropriate marital conduct. The court found that the apartments were the separate property of Wife. As to 1203 Scenic Hill Drive, the trial court held:

[T]hat said property may have both qualities as separate and marital property, but the court finds specifically that said property currently has no equity and in the event that it did, said equity would have been more than offset by the Internal Revenue Service debt which has been paid by the Wife and therefore, [Wife] is hereby awarded all of the parties' rights, titles and interest to said

property and the Husband is hereby divested of all interest to said property located at 1203 Scenic Hill Drive . . . .

The court further provided:

> [T]he obligation which was owed and is possibly still owing to the Internal Revenue Service for income tax for the years 2000-2009 is a marital debt and . . . the Wife has paid in excess of $440,000.00 on said debt.  In the event that there are additional monies owing to the Internal Revenue Service for the parties' taxes up until and through the tax year of 2009, the Wife shall be responsible for said debt.

* * *

> The Wife shall be awarded all of the parties' rights, titles and interest to the following:  2000 Ford Expedition automobile, 2004 Ford Ranger truck, 2002 Kawasaki motorcycle, 2001 leased sweeper, both pressure washers in her possession, 16 ft. trailer, 12 ft. mowing trailer, outside metal furniture at her house, all household furniture and furnishings at 1203 Scenic Hill Drive, 1995 GMC sweeper, zero turn Grasshopper mower and all of the Wife's bank accounts.  The Wife is further awarded her additional separate property which includes the hot tub and all of the furniture located at 1203 Scenic Hill Drive, which she brought into the marriage.
>
> The Wife shall pay the Discover card in her name, the Lowe's account in her name, the Chase Mastercard in her name, the Home Depot account in her name, the indebtedness owed to Judy Moss, any balance owing to the Internal Revenue Service, the balance owed on the 2001 leased sweeper, as well as any other debts in her name.
>
> The Husband shall be awarded all of the parties' rights, titles and interest to the 2004 F150 Ford truck, the Craftsman tool box, the household furniture and furnishings located at 1210 Crest [H]ill Drive, the 1995 sweeper in the Husband's possession, zero turn Grasshopper mower in the Husband's possession, the battery charger, trimmer, chain-saw and air compressor in the Husband's possession and the Husband's bank accounts.  The Husband shall also be awarded as his separate property the red tool box.
>
> The Husband shall be responsible for his credit card debts and any other debts solely in his name.

-7-

The Court finds that the residence located at 1216 Crest [H]ill Drive, Louisville, Tennessee, is marital property and Orders that the same shall be sold and that any equity received as a result of said sale shall go to the Wife based on the fact that she has paid the entire IRS indebtedness and this indebtedness to the IRS more than offsets any equity available from the sale of this property. The Wife shall have the exclusive right to prepare this property for sale and to market the same. The Husband shall vacate said residence by May 1, 2012, and the Wife shall have exclusive right to the possession of said residence pending its sale. Upon the Husband vacating said residence, he shall bring all keys and garage door openers to his attorney who shall furnish said keys and garage door openers to the Wife's attorney for delivery to her.

As to Wife's tort action, the court further ruled:

The Wife has raised a tort claim against the Husband seeking judgment as a result of an assault and battery and the Court hereby finds that the Husband did commit assault and battery against the Wife and awards to her compensatory damages in the amount of [$13,284.10]. The Wife shall have judgment in the amount of [$13,284.10] against the Husband . . . for which execution may issue if necessary.

The Wife further raised in her tort claim a claim for punitive damages and the Court hereby reserves the issue of whether or not to award punitive damages and the amount thereof, conditioned upon the Husband's full compliance with the Court's Order and the Court's further consideration of the evidence previously received. The parties shall schedule a time to come back before the Court for the Court's ruling on this issue.

A motion to alter or amend judgment was filed by Wife raising two issues. The first issue dealt with the Crest Hill Drive house. In the motion, Wife asked the trial court to award her the home and not force it to be sold due to the state of the housing market at that time. The second issue raised by Wife addressed the trial court's award of compensatory damages in the tort claim. The amount of $13,284.10 originally ordered equaled the cost of Wife's out-of-pocket medical bills incurred and did not include any award for pain and suffering, loss of enjoyment of life, and permanent impairment. Wife requested the trial court reconsider and award her additional compensatory damages based on those factors.

After a hearing, Husband agreed with Wife's request that she be awarded the Crest Hill Drive house, rather than ordering it be sold. As to the issue of compensatory damages,

the trial court increased the amount awarded to Wife to $38,284.10. On the punitive damages issue, the court awarded Wife $10,000. Husband filed a timely appeal, but no transcript of the hearing on the motion to alter or amend was included in the record.

## II. ISSUES

Husband raises the following issues on appeal, which we restate as follows:

a. Did the trial court make an inequitable division of property;

b. Did the trial court correctly award compensatory and punitive damages for Wife's alleged personal injury.

## III. STANDARD OF REVIEW

We review a trial court's factual findings de novo on the record, affording the trial court's findings a presumption of correctness, and we will not reverse the trial court's findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). Questions of law are reviewed de novo without the presumption of correctness. *See Langschmidt v. Langschmidt*, 81 S.W.3d 741, 745 (Tenn. 2002).

We give great weight to the factual findings of the trial court which rest on determinations of witness credibility. *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). Accordingly, we will not reevaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

The trial courts are vested with a great deal of discretion when classifying and dividing a marital estate. Typically, the trial court's decision will not be disturbed on appeal unless the decision is contrary to the preponderance of the evidence or is based on an error of law. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002).

## IV. DISCUSSION

"Tennessee is a 'dual property' state because its domestic relations law recognizes both 'marital property' and 'separate property.'" *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010) (citing *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009); Tenn. Code

Ann. § 36-4-121). The division of the parties' marital estate begins with the classification of the property as separate or marital; separate property is not part of the marital estate and, therefore, is not subject to division. *Id*. "The classification of property as separate or marital presents a question of fact which must be determined in light of all the relevant circumstances." *Welch v. Welch*, No. M2013-01025-COA-R3-CV, 2014 WL 107982 (Tenn. Ct. App. Jan.10, 2014).

Once property has been classified as marital property, the court is to place a reasonable value on the items subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003). The parties have the burden to provide competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App.1998). When evidence is conflicting, the court may place a value on the property that is within the range of the values presented. *Watters v. Watters,* 959 S.W.2d 585, 589 (Tenn. Ct. App.1997). Decisions regarding the value of marital property are questions of fact. *Kinard*, 986 S.W.2d at 231.

Marital property, once valued, must be divided equitably between the parties without regard to fault. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). A division of marital property in an equitable manner does not require that the property be divided equally. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). An equitable division of property must reflect consideration of the factors in Tennessee Code Annotated section 36-4-121(c). *Kinard*, 986 S.W.2d at 230.

**IRS Debt**

Husband asserts that a major determinative factor considered by the trial court was the parties' debt to the IRS. He contends that the debt should not have been considered because it had been paid in full prior to the trial in this case.

Marital debt is subject to equitable division in the same manner as marital assets. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In *Alford*, the Tennessee Supreme Court defined marital debt consistent with the definition of marital property, which is defined by statute as property acquired by either spouse during the course of the marriage up to the date of final hearing and owned by either or both spouses as of the date of the filing of the complaint for divorce. Tenn. Code Ann. § 36-4-121(b)(1)(A). Debts incurred by either or both spouses during the course of a marriage are properly classified as marital. *Id.*, 120 S.W.3d at 811. They include debts incurred up to the date of the final divorce hearing. *Id.* at 813.

The IRS debt was clearly marital. Three payments totaling $198,232.87 were paid on the debt by Wife prior to the date of the filing of divorce in August 2010. Wife paid $243,000 in additional payments after the divorce complaint was filed but before the date of the final hearing. Significantly, despite Husband's position regarding the extinguishment of the debt, the record does not reflect that the IRS ever made a determination that it had been satisfied.

Upon review of the record and in consideration of the relevant statutory provisions, we are satisfied that the court did not abuse its discretion in its ruling regarding the debt.

## Separate Versus Marital Property

Husband contends the trial court did not clearly classify the parties' separate property from the marital property. There were two significant assets owned by Wife prior to the marriage – the apartment complex and 1203 Scenic Hill Drive. Husband argues that a relevant issue was whether either of these assets increased in value during the marriage and, if so, whether any equity should be considered as marital property.

Assets owned by a spouse prior to marriage are to be considered the separate property of that spouse. Tenn. Code Ann. § 36-4-121(b)(2)(A). However, Tennessee Code Annotated section 36-4-121(b)(1)(B) includes as marital property any income from and any increase in value during the marriage of property determined to be separate property if each party substantially contributed to its preservation and appreciation. In order to prove an increase in the value of separate property, a non-owner must present evidence that proves the value of the separate asset prior to marriage. *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). If there is no proof of the value of a separate asset before the parties married, a court has no legitimate basis to determine that an asset has appreciated. *Id.*

Wife observed that throughout the marriage, Husband did very little work on the apartments other than occasionally mowing. However, Husband contended that he had painted, cleaned, mowed, and put carpet down, thereby evidencing that he had preserved and maintained the value of the apartments. He offered no witnesses and gave no testimony as to the value of any investment he put into the apartments or the actual value of the complex at the time of the parties' marriage or at the time of the divorce hearing. Husband's name was never placed on the apartments. He did not file a statement of marital assets and liabilities with values and only testified as to limited values dealing with the two houses. In light of the lack of proof before it, the trial court was under no obligation to do anything further after ruling that the apartments were Wife's separate property.

As to 1203 Scenic Hill Drive, the trial court specifically stated as follows:

I do further find in these unique situations in light of the act of God, as well as the tragedy that occurred as far as the residence is concerned on the fire, that no equity exists in that residence . . . . Again, whatever equity there might have been in the property no longer exists. Even if it did, it's got to be offset by the substantial IRS debt based on all of the proof that I have received. . . ."

At the time of the refinance in June 2010, 1203 Scenic Hill Drive appraised at $335,000. In April 2011, however, both fire and storm damage occurred to the property. Wife received insurance proceeds in the amounts of $90,000 for the fire damage and $50,000 for the storm damage. According to Wife's testimony, very little repairs had been made, as all of the insurance proceeds were used to make payments to the IRS. Based on the fact that the home had not been repaired, Wife opined that it was only worth $250,000, while there existed a mortgage indebtedness of $257,000. Husband testified that Wife had installed a large stone patio, outdoor fireplace, new outbuilding, and a new privacy fence. He contended that the home, despite the fire and hail damage, was worth $375,000, leaving equity in the property of $118,000.[2] This amount was $40,000 more than the house appraised for prior to the damage.

The record supports the determination of the trial court that no equity existed in this home. No other specific findings were required.

The last property at issue is 1216 Crest Hill Drive. Husband contends that the trial court improperly used this marital asset to reimburse Wife for making the IRS payments. He argues that such reimbursement is not an element found at Tennessee Code Annotated section 36-4-121(c). According to Husband, he now grosses just $39,000 per year compared to Wife's annual net income that exceeds $150,000.

At the time of the divorce, Wife valued the Crest Hill Drive home at $175,000 with a mortgage debt of $93,600. Husband opined that the home was worth around $155,000 because part of the property's yard was re-platted and put with the Scenic Hill Drive home. The trial court stated it was finding in accord with Wife's proposed division of assets and liabilities. In her proposal, Wife suggested that Husband be awarded his vehicle, certain equipment, tools and household furnishings with a total value of $29,500. Husband was allocated his credit card debt of $5,800, giving him a net marital equity award of $23,700. The division to Wife included all of the equity in 1216 Crest Hill Drive, which was $84,000,

_____

[2]Husband stated that the same hail storm damaged the Crest Hill Drive house as well. Windows in that home were broken and the roof was damaged. Husband did not file an insurance claim.

and her vehicles and certain equipment, totaling $106,500.  Wife, however, was to assume all of the IRS liability and the following debts:  Discover Card – $12,900; Lowe's – $4,500; Chase Mastercard – $4,600; Home Depot – $5,800; and the loan from Judy Moss – $20,000.  These debts, excluding the IRS debt, totaled $47,800, making the net marital equity awarded to Wife $58,700.

As noted by Wife, Tennessee Code Annotated section 36-4-121(c)(5) provides that one of the factors the court shall consider in making an equitable division is "[t]he contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property."  Husband engaged in actions that dissipated the marital property available for equitable distribution during his involvement with Ms. Valentine.  It further is undisputed that the IRS was taking action to collect the debt which put all of the assets at risk.  The couple was denied an opportunity to resolve the debt with collection alternatives being offered because Husband would not cooperate by filling out the required Form 433A.  But for the actions of Wife, there would be no marital property, as the parties would have lost everything that they had.  In our view, the trial court properly determined that the award of $58,700 of the marital estate to Wife versus $23,700 awarded to Husband was a fair and equitable division.

## Damages Award

Husband complains that the trial court erred in awarding $38,284.10 in compensatory damages and $10,000 in punitive damages.  He complains that the trial court made no findings to support its ruling.

Husband failed to include in the record a transcript of the hearing of September 17, 2012, wherein the court addressed and made findings relative to compensatory and punitive damages.  Accordingly, Husband failed to comply with Tennessee Rules of Appellate Procedure Rule 24(b).  When an appellant fails to produce a record of trial, it is presumed that the evidence supports the ruling of the trial court. *Bishop v. Bishop*, 939 S.W.2d 109 (Tenn. Ct. App. 1996).

Wife testified that the assault was frightening and the injuries which she received were painful. She suffered permanent injury from a fractured tooth below her gumline. Protracted and long-term dental work was required, including extraction of the tooth, root canal, dental implantation and the construction of a new bridge.  Wife testified that for a period of time she was unable to consume anything but liquids and that it was humiliating and difficult to go through the lengthy dental procedures that were required.  Wife further related a loss of enjoyment of life in that she constantly was scared to the point that she obtained a

-13-

surveillance system to monitor the outside of her home.  The record before us reveals the determination of the trial court was supported by a preponderance of the evidence.

In this matter, Wife filed a motion to consider post-judgment facts pursuant to Rule 14 of the Tennessee Rules of Appellate Procedure.  The motion revealed that on April 14, 2013, Husband pled guilty in the Circuit Court for Blount County to the aggravated assault against Wife.  It is Wife's "position that [Husband]'s plea of guilty wherein it was provided that the restitution was to be paid as set out in the divorce action is certainly relevant to the issues before this [c]ourt where [Husband] now attacks the award of compensatory and punitive damages relating to the assault."  She further observed:

> [T]he [Husband] has consistently taken the position at Trial Court and in his Brief before this Honorable Court that this assault, in fact, did not happen. The fact that [Husband] has now pled guilty to this charge and received three (3) years of supervised probation [is] certainly relevant to the issues before this Court dealing with the damages awarded in the assault.

The information presented consisted of undisputed facts that affected the position of the parties.  Inasmuch as Husband had taken the position that the assault did not happen and was fabricated by Wife, and inasmuch as he stated in his guilty plea that restitution was to be paid as set out in the divorce action, we grant Wife's motion to consider the post-judgment facts. The information further supports our finding that the compensatory and punitive damages awards were justified.


### Frivolous Appeal

Wife argues that the present appeal by Husband is frivolous.  Tennessee Code Annotated section 27-1-122 provides as follows:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

"An appeal is deemed frivolous if it is devoid of merit or if it has no reasonable chance of success."  *See Bursack v. Wilson*, 982 S.W.2d 341, 345 (Tenn. Ct. App. 1998).

In this cause, where Husband questioned the trial court's findings of fact as to the

award of compensatory and punitive damages, he provided no appellate record to support his argument. The party raising an issue on appeal is obligated to give the appellate court a record that is sufficient for an appropriate review of the issues raised. Tenn. R. App. P. 24; *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989). An appeal in which the appellate court's ability to address the issues raised is undermined by the appellant's failure to provide an adequate record may be deemed frivolous. *Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003).

Husband likewise challenged the court's ruling regarding property division but failed at trial to put any evidence of the value of the apartments before the court and failed to introduce any evidence of the value of his contributions to the apartments. As to the Scenic Hill Drive property, the court specifically found that there was no equity in the property and yet Husband challenged the court for not making a determination of whether the property was marital or separate. We find that Husband's appeal was devoid of merit. Accordingly, we award Wife her reasonable damages incurred as a result of this appeal, including but not limited to her attorney's fees, costs, and expenses. The cause is remanded to the trial court for a determination of Wife's damages.

# V. CONCLUSION

The judgment of the trial court is affirmed. This case is remanded for further proceedings consistent with this opinion. Husband's appeal is deemed frivolous under Tennessee Code Annotated section 27-1-122. Costs on appeal are taxed to Tony Dale Rayfield.

_____
JOHN W. McCLARTY, JUDGE